DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
DAVID MARROSO (S.B. #211655)
dmarroso@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

RICHARD G. PARKER (S.B. #62356)
rparker@omm.com
EDWARD D. HASSI (*pro hac vice* to be filed)
ehassi@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Plaintiff Global Music Rights, LLC*

# UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

GLOBAL MUSIC RIGHTS, LLC,

      Plaintiff,

    v.

RADIO MUSIC LICENSE
COMMITTEE, INC., and DOES 1
through 3,000,

      Defendants.

Civil Action No.:

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiff, GLOBAL MUSIC RIGHTS, LLC, with its principal place of business located at 1100 Glendon Avenue, Suite 2000, Los Angeles, California 90024, by its attorneys, brings this action for damages and permanent injunctive relief against Defendant, RADIO MUSIC LICENSE COMMITTEE, INC.  Plaintiff alleges as follows:

### NATURE OF THE ACTION

1.     The Radio Music License Committee ("RMLC" or "Defendant") operates an illegal cartel.  Its members, including powerful radio broadcasters like CBS Radio and Cumulus Media, as well as Los Angeles-based companies like Mt. Wilson Broadcasting and Point Broadcasting, have agreed with one another and with the RMLC to artificially depress the license fees member stations pay to perform musical compositions on the radio.  The RMLC minces no words.  Its "overwhelming objective is to keep license fees for the commercial radio industry as low as [it] can possibly keep them."

2.     The RMLC accomplishes its objective, and has for decades, by exercising market dominance and brazenly violating competition laws.  RMLC stations represent more than 90% of the country's terrestrial radio revenue.  No songwriter can afford to be silenced on a platform that reaches 245 million listeners weekly.  Unable to negotiate freely and fairly, and under threat of a group blockade from radio, the songwriters and the companies that represent them are forced to capitulate to the artificially depressed license fees the RMLC cartel demands.

3.     The irony is that, until recently, the RMLC exploited its market power primarily against two performance rights organizations—ASCAP and BMI—that began as monopolists themselves, were sued for antitrust violations decades ago, and are subject to consent decrees.  These consent decrees effectively require ASCAP and BMI to grant performance licenses to RMLC member stations (and others) and to submit any disputes over the proper fee to a rate court.

4.     Plaintiff Global Music Rights ("GMR" or "Plaintiff") is a new and

innovative performance rights organization—the first entrant into the market in over 70 years.  It offers an elite roster of just over 70 songwriters something fresh. In exchange, GMR has been granted the right to license to others the public performances of the songwriters' compositions, including to members of terrestrial radio.  Unlike ASCAP and BMI, however, GMR is not subject to a consent decree, compulsory license, or rate court.  It operates in the free market—or so it should.

5.     But the RMLC and its members reject the free market.  A "free market approach to music licensing" without required licenses and rate court, the RMLC has testified, would "wreak havoc" on their artificially low cost structure.  Radio station owners do not want to pay the license fees that a free market would demand for GMR songwriters' premium content.  Rather than embracing the market and competing with one another, the RMLC's members took the opposite tack by colluding.  Representing over 90% of the terrestrial radio industry, the RMLC flexed their collective muscle to attempt to force GMR to submit to a mandatory licensing scheme and artificially depressed license fees.  Unless GMR succumbs to these monopsonistic demands, GMR songwriters will not have access to the vast majority of terrestrial radio stations, a media outlet that remains crucial for songwriters' financial and reputational success.

6.     Everyone is harmed by the RMLC's illegal conduct:  if songwriters are not compensated fairly for their works, they will have less incentive to compose the great music that enriches *all* our lives.  If RMLC's scheme succeeds, new songwriters will have less incentive to become this generation's Ira Gershwin; or to pen the 21st century *Imagine* (John Lennon), *Lyin' Eyes* (Henley and Frey), or *Master of Puppets* (Hetfield and Ulrich); or to give the flair and creativity of Pharrell William's feel-good smash *Happy* or One Republic's anthem *Counting Stars* (to name a few of the premium works in GMR's repertory).  Incentivizing creativity and harnessing talent is the copyright law's fundamental purpose.

7.     Unfortunately, the RMLC cartel has been a smashing success—if one

fairly can describe violating the law and paying songwriters below-market rates to perform compositions a "success."  In a multi-billion dollar industry that relies on music for its lifeblood, terrestrial music radio stations pay less than 4% of their revenues—an infinitesimal percentage—to the songwriters who create that music. (News, talk, and other stations that rely less on music pay even less.)  Other media distributors such as streaming music services, who do not benefit from a cartel cutback, pay substantially more of their revenue share to perform these same works. The RMLC's conspiracy is perverting the market and retarding prices.

8.     Antitrust and competition laws forbid this.  An alliance of buyers exercising market dominance to *reduce* prices is just as pernicious and dangerous as an association of sellers exercising market dominance to *increase* prices.  A monopsony is just as illegal as a monopoly.  Radio stations are horizontal competitors and the antitrust laws do not permit them to join together as a cartel. They compete with each other to attract listeners and advertisers.  They make money selling commercial spots to those advertisers.  The more listeners they attract, the more they can charge advertisers for those spots.  They attract listeners with content.  The better their content, the more listeners they attract; the more listeners they attract, the more they can charge advertisers.  This creates what is known as a virtuous circle.

9.     Of course, there is nothing virtuous about the way the RMLC cartel members have conspired for the express purpose of reducing what they pay songwriters for the music they use to attract listeners.  In a normally functioning market, radio stations would compete for the music they play by paying songwriters based on the quality and popularity of their work.  Songwriters would be rewarded fairly for their creative efforts and encouraged to continue these creative efforts. But radio stations do not compete for the right to perform musical compositions. Songwriters—and GMR—suffer the financial consequences.

10.     GMR was created to give a select group of highly-skilled songwriters

the opportunity to negotiate a reasonable market rate for songs they write.  GMR simply sought "fair pay for fair play."  In response to that, the RMLC cartel threatened "low pay or no play."

11.    For these reasons, and as outlined in greater detail below, GMR files this action for damages and injunctive relief against the RMLC for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; the California Cartwright Act, Cal. Bus. & Prof. Code § 16720; and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### THE PARTIES

12.    Plaintiff GMR represents music rights holders in the licensing of their public performances.  GMR offers licensing, distribution, and collection services for the exclusive rights granted to music creators and owners by copyright law. GMR is a Delaware limited liability company with its principal place of business at 1100 Glendon Avenue, Suite 2000, Los Angeles, California 90024.

13.    Defendant RMLC serves as the negotiating arm for the entire commercial radio industry.  It purports to be a 501(c)(6) corporation organized and existing under the laws of Tennessee, with its principal place of business at 1616 Westgate Circle, Brentwood, Tennessee 37027.  On information and belief, the RMLC has agreed with, and negotiates on behalf of, hundreds of commercial radio stations located throughout California, including many stations located in this District, such as KRTH, KAMP, KKGO, and KLOS.

14.    The true names and capacities of Defendants named herein as Does 1 through 3,000 are unknown to Plaintiff.  Plaintiff will seek leave from this Court to amend this Complaint to identify these Defendants' true names and capacities, once such information has been ascertained.  Plaintiff alleges that Does 1 through 3,000 participated in Defendants' misconduct, as herein alleged, and are therefore liable to Plaintiff for the same.

**JURISDICTION AND VENUE**

15.     GMR brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and the costs of suit, including reasonable attorneys' fees; to enjoin the RMLC's anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for the RMLC's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  GMR also brings suit for violations of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720; and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

16.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that the Sherman Act cause of action asserted in this Complaint arises under the laws of the United States.  This Court has supplemental jurisdiction over the related claims for violations of California statutory law alleged herein, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)-(d) and 15 U.S.C. § 22 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, and one or more of Defendant's co-conspirators reside, are licensed to do business in, are doing business in, have and had agents in, and/or are found to transact business in this District.

18.     The Court has personal jurisdiction over Defendant RMLC because it does continuous and systematic business within the State of California, and has purposefully availed itself of the protection of California law.   Additionally, Defendant RMLC is a corporation with minimum contacts to the United States. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir.

1  2004).

2  **FACTUAL BACKGROUND**

3  **A.    The Music Rights Business**

4      19.    GMR was created in 2013 as a boutique performing rights

5  organization to represent a select group of writers who believed they were being

6  underserved by the existing performing rights organizations.  GMR created a new

7  and alternative model that recognizes individual musical works are not like widgets;

8  they are unique, and do not all have the same value in the marketplace.  GMR

9  intends to represent a small number of highly talented copyright owners and,

10  through increased license fees and decreased infrastructure, bring their

11  compensation in line with the value these songwriters' works represent.  And GMR

12  offers a distinct value proposition to radio stations and other media service

13  providers, due to the quality of its songwriters and catalog, and the increased

14  advertising revenue that catalog can generate.

15      20.    Musical compositions are considered intellectual property, and like

16  other forms of property, they belong to their creators.  United States copyright law

17  grants certain exclusive rights to these owners, including the right to authorize

18  others to publicly perform their music.  *See* 17 U.S.C. § 106.  If a business plays

19  music without obtaining the necessary advanced permission from copyright owners,

20  it acts in violation of federal copyright laws.

21      21.    Under the Copyright Act, the copyright owner of a musical

22  composition has the exclusive right to authorize the public performance of their

23  copyrighted work.  17 U.S.C. § 106(4).  This is known as the "Performing Right."

24  No one can publicly perform copyrighted music without the permission of the

25  copyright owner.  The burden is on the entity seeking such a performing right to

26  obtain it from the copyright owner.  Copyright owners have a right to be paid for

27  the use of their intellectual property, including the Performing Right.

28      22.    The Copyright Act defines a public performance as one in "a place

open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered."  17 U.S.C. § 101.   A  public  performance  is  also  one  that  is  transmitted  or  otherwise communicated to the public by means of a device or process, such as by radio or television broadcasts, music-on-hold, cable television, and over the internet.  *See id.*

23.    In the United States, terrestrial broadcasters (*i.e.*, AM or FM radio stations) do not pay performers or sound recording copyright owners.  In contrast to satellite  broadcasters  and  digital  services,  terrestrial  broadcasters  only  pay  the songwriters who own the copyright on the song for the public performance of a song.

24.    The vast majority of copyright owners are represented by one of two performing rights organizations ("PROs"):  the American Society of Composers, Authors and Publishers ("ASCAP"), or Broadcast Music Inc. ("BMI").  PROs pool the percentage share of the copyrights held by their composer, songwriter, and publisher members into a "repertory," and collectively license those rights to music users, including terrestrial radio broadcasters.

25.    In the United States, ASCAP and BMI are by far the largest PROs and are responsible for licensing an overwhelming majority of works.  ASCAP has a membership  of  over  600,000  composers,  songwriters,  lyricists,  and  music publishers, and lists over 10 million licensed works in its repertory.  Likewise, BMI boasts a repertory of 8.5 million musical works, created and owned by more than 750,000 songwriters, composers, and music publishers.  A third PRO, the Society of European Stage Authors and Composers ("SESAC"), represents approximately 35,000 music authors and publishers.  SESAC's repertory includes as many as 400,000 or more musical works.

26.    Because  ASCAP  and  BMI  have  so  many  compositions  in  their repertories, they were believed by the United States Department of Justice ("DOJ") to have market power in setting license fees.  Decades ago, ASCAP's repertory held

over 90% of all copyrighted musical works.  When ASCAP raised rates by over 400%, the DOJ brought a civil antitrust lawsuit against ASCAP.  In 1941, the DOJ resolved that lawsuit by way of a civil consent decree, which has been significantly amended on two occasions since then, most recently in 2001.

27.    In an effort to establish an alternative to ASCAP, broadcasters, including many RMLC members, created BMI.  In 1941, BMI and the United States entered into a consent decree to resolve concerns similar to the DOJ's concerns with ASCAP.  The parties amended that decree most recently in 1994.

28.    The DOJ consent decrees were designed to limit ASCAP's and BMI's exercise of the power they achieved by accumulating copyrights to millions of musical works—at the time, virtually all the works played on the radio.  Today, ASCAP and BMI collectively account for more than 95% of the songwriters whose interests are represented by United States PROs, and in excess of 95% of the total musical works in all United States PROs' repertories.

29.    ASCAP and BMI, as well as smaller PROs, license music typically— though not always—through "blanket licenses."  The PRO licenses provide access to each organization's percentage shares of their entire repertory without regard for what specific songs are used or how often the songs are played.  The market demands this kind of offering due to the enormous administrative costs that would occur in a world where each performance of each composition is individually negotiated and documented.

30.    In *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979), the Supreme Court recognized that ASCAP's and BMI's blanket licenses provide valuable benefits that no individual rights holder could match, including the "immediate use of covered compositions, without the delay of prior individual negotiations."  *Id.* at 21-22.  In light of these benefits, and recognizing the value of the consent decrees, the Court concluded that the PROs' blanket licensing practices did not constitute *per se* illegal price fixing.  *Id.* at 16-24.

31.     There is broad consensus that PROs provide a valuable service to both music users and PRO members.  The PROs allow music users to obtain access through licenses that protect them from infringing on copyrights to millions of works controlled by the hundreds of thousands of songwriters, composers, and publishers that have contributed their interests in songs to the PROs.

32.     Music creators also benefit from the PROs' licensing practices.  For many songwriters and composers, affiliating with a PRO and contributing their shares of works to the PRO's repertory provides the only practical way of licensing their shares of works.  While direct licensing to individual music users remains available as an alternative for music creators, it would be highly impractical for individual music creators to themselves enter into licenses with each of the thousands of radio stations and other music users to which ASCAP and BMI license their repertories.  Even where direct negotiations are possible, users and creators alike often find PRO licenses more efficient.  Furthermore, PROs are able to police and enforce infringement in a way individual songwriters could not.  It would be far more difficult and costly for the individual songwriters, composers, and publishers to police the broadcast industry on their own.  For these reasons, it is no surprise that no single songwriter individually negotiates with a significant percentage of radio stations in the United States for the purpose of performing compositions.

33.     The consent decrees require ASCAP and BMI to provide a license to anyone who requests it.  Disputes over license fees are resolved by courts specially appointed to regulate ASCAP and BMI.  Individual radio stations have schemed together under the RMLC and negotiate as a single unit rather than competing for licenses.  Consequently, royalties are kept artificially low, and radio stations devote only a small fraction of their revenues—roughly 4%—to paying copyright owners, even though the quality and variety of music they broadcast to consumers is a major factor that drives the stations' advertising revenues.  Other media distributors, such

as streaming music services, who do not benefit from a cartel cutback, pay substantially more of their revenue share to perform the same works.

34.    For years, songwriters' performance rights have been undervalued because the organizations that represented the vast majority of them—ASCAP and BMI—were so large and powerful that they were required to submit to rate-setting controls.  The only other United States PRO is a company named SESAC.

**B.    Global Music Rights**

35.    GMR set out to create a better product and service for the songwriter. GMR has not accumulated and has no intention to amass the market power that other PROs have wielded.  Just the opposite, GMR's entire business model is predicated on being a boutique PRO to a small group of extremely talented songwriters.  Key to this model is remaining highly selective in choosing the songwriters it represents and running a lean, cost-efficient operation.  By representing only a handful of the extraordinary songwriters and publishers that drive advertising revenues, GMR is able to provide individualized service and achieve outcomes—such as royalties measured by the value those songwriters generate—that songwriters cannot get with behemoths like ASCAP and BMI or even from SESAC.  GMR has the advantage of creating a  modern royalty system that responds to today's marketplace, in which data regarding performances is more readily available.  This provides GMR with agility and the ability to provide increased clarity to its clients.

36.    GMR's fundamental premise is "fair pay for fair play."  Its philosophy is founded on the following principles, which distinguish GMR from other PROs:

> a.    GMR set out to pay the songwriters more money for the performances of their copyrighted compositions through a combination of reduced overhead and obtaining license fees reflecting the overall high quality and value of the compositions in the GMR repertory.

b.    Other PROs have an arbitrary and unpredictable formula to determine how much money each "spin" of a given song merits. GMR provides increased clarity on exactly how its songwriters are paid.

c.    Most GMR writers receive guarantees, either in the form of an annual minimum or in the form of a guaranteed premium over what the writer would have made with another PRO. For songwriters with an established body of work (so-called "catalog writers"), GMR guarantees a minimum revenue stream for each year they are under contract. If for some reason the songwriter's spins drop, GMR still pays the guarantee. GMR assumes the risk of a reduction occurring. Naturally, this provides GMR with an incentive to ensure not only that its clients' works are being properly licensed, but also that royalties are commensurate with the value of the songwriters' works.

d.    ASCAP and BMI each represent hundreds of thousands of writers. Even the much smaller SESAC has tens of thousands. There is simply no way to provide high-quality customer service to that many people. GMR, in contrast, deliberately represents only a small number of talented songwriters. This allows GMR to function as a "concierge PRO," providing prompter and more personalized service.

37.    GMR cannot offer its songwriters these benefits unless it remains small. GMR is infinitesimally small compared to ASCAP and BMI.

| (estimates) | ASCAP | BMI | SESAC | GMR |
|---|---|---|---|---|
| # of composers (est) | 600,000+ | 750,000+ | 30,000+ | 70+ |
| # of compositions (est) | 10,000,000+ | 12,000,000 | 400,000+ | 26,000+ |

In other words, GMR's client base comes to about 0.006% of the total population of songwriters, composers, and publishers collectively represented by the four U.S. PROs and an even smaller percentage of the total number of compositions in their repertories. This is by design. By keeping its catalog small and high-quality across the board, GMR is able to provide personalized customer

1   service to its songwriters and keep the cost of those services low.

2       38.    GMR may be small but its songwriters are accomplished.  GMR's

3   repertory includes songs performed by everyone from John Lennon to Justin

4   Bieber, from Smokey Robinson to Steve Miller, from Shakira to Drake, and from

5   Randy Travis to Kenny Chesney—again, to name just a few.  The quality of

6   GMR's repertory—in particular the fact that every one of the GMR songwriters is

7   an established composer with a track record of success—translates directly into

8   more advertising revenue for the radio stations who license and broadcast it and is

9   what justifies the royalties GMR seeks for its clients.

10       39.    GMR's repertory is unique in that it focuses **_solely_** on premium

11   content, allowing GMR to tailor its business model to best serve the songwriters

12   that generate it.  This includes operating in a more cost-efficient, client-focused

13   manner, and seeking compensation for its songwriters based on the value their

14   works generate without the burden of the infrastructure necessary to service the

15   needs of hundreds of thousands of writers.  In this way, GMR's business model

16   corrects an inefficiency in how some songwriters creating premium content are

17   compensated, assuring that these songwriters are incentivized to continue their

18   creative and musical innovation as contemplated by the Copyright Act.

19       40.    GMR is also not subject to the judicial rate regulation mandated by the

20   ASCAP and BMI consent decrees, which resulted from ASCAP's and BMI's

21   anticompetitive conduct.  For example, some 80 years ago, ASCAP was alleged to

22   have possessed a dominant share of all compositions available for public

23   performance and, exercising that control, increased the rates it charged to license

24   the works by **_446%_** over a period of eight years.  GMR does not have a dominant

25   share (or anything approaching a dominant share) of compositions and, as a

26   start-up, there is no history of exercising some dominance to arbitrarily raise prices.

27   Nor is GMR subject to the voluntary agreement entered into recently between the

28   RMLC and SESAC, which concerns the licensing of compositions in SESAC's

1    repertory.

2          41.   GMR offered songwriters a new option for their PRO.  Starting in

3    2014, GMR began competing with ASCAP, BMI, and SESAC to sign writers.

4    While GMR has convinced some songwriters to come on board, others have chosen

5    ASCAP, BMI, or SESAC.  This is what the free market is all about.

6          42.   Of course, GMR songwriters' works do not represent all high-value

7    songs played on the radio, a substantial portion of them, or even a majority of them.

8    Despite the entrance of GMR, ASCAP, BMI, and SESAC maintain thousands upon

9    thousands of premium compositions in their respective repertories.  GMR cannot

10   and does not affect radio's access to high-value, premium content as a general

11   matter.  But because BMI and ASCAP are large organizations with tens or

12   hundreds of thousands of affiliates, they cannot and do not provide the

13   client-centric approach GMR offers.

14   **C.     The RMLC**

15         43.   The RMLC is funded by the radio broadcasting industry and represents

16   the collective interests of the vast majority of commercial radio stations in the

17   United States—some 10,000 stations—in connection with music licensing matters.

18   The RMLC's constituents comprise approximately 90% of the U.S. terrestrial radio

19   industry.

20         44.   The RMLC's avowed "mission" is to "negotiate public-performance-

21   right license fees with performance rights organizations for the benefit of its

22   members and the commercial radio industry (some 10,000 radio stations)."[1]  In

23   other words, the RMLC's *raison d'être* is to facilitate massive group negotiation by

24   and among the thousands of commercial radio stations that make up almost the

25   entirety of the domestic terrestrial radio industry.

26         45.   The RMLC has been negotiating license terms with ASCAP and BMI

27   
       ―――――――――――――――
28   [1] Compl. ¶ 11, *Radio Music License Comm., Inc. v. SESAC, Inc., et al.*, No. 2:12-
     cv-05807-CDJ (E.D. Pa. Oct. 11, 2012) (ECF No. 1).

- 13 -

for decades, including license fees for the public performance of copyrighted musical works.

46.     Periodically, when such negotiations have reached impasse, the RMLC has coordinated and funded "rate court" litigation under the auspices of the ASCAP and BMI consent decrees.  According to its mission statement, the RMLC "raises funds from the industry in the amounts required to conduct effective negotiations and/or court litigations."

47.     As this makes clear, the RMLC is not a typical industry trade association.  The RMLC's *sole* purpose is to retard license pricing, and, failing that, to litigate with the PROs to achieve their illegal objective.  Other organizations, such as the National Association of Broadcasters, serve as traditional trade associations and lobby groups representing the interests of commercial and non-commercial over-the-air radio broadcasters in the United States.  Unlike the RMLC, they do not conduct group-price negotiations with PROs or copyright holders.

**D.     The RMLC's Member Stations Are Horizontal Competitors**

48.     The RMLC's "direct" members own and operate approximately 7,300 broadcast radio stations in locations throughout the United States.  In addition, the RMLC represents approximately 2,500 "bound" stations—stations that are not formal members of the RMLC, but which are required by court order to pay fees to support the RMLC's operational expenses.

49.     The RMLC's Committee and Executive Committee are comprised of executives from many of the largest terrestrial radio conglomerates in the country, including CBS Radio, Cox Broadcasting, Cumulus Media, Entercom, and others.  These committee members' companies directly compete with one another in the terrestrial radio market.

50.     The RMLC's member stations compete head-to-head for the business of local and national companies that seek to advertise on broadcast radio.

51.     The RMLC's member stations compete for advertisers by demonstrating they have a significant number of listeners that meet the advertiser's target demographic.

52.     The RMLC's member stations compete for listeners by providing content to those listeners.  Frequently that content is copyrighted music which must be licensed from the various PROs.

53.     In a normally functioning market, the RMLC's member stations would be expected to compete for the content they broadcast, including copyrighted music, in order to attract listeners.  RMLC member stations compete in an open market for on-air personalities, plus sports and syndicated programming; however, because of the RMLC cartel, these stations do not have to compete to play popular songs.

**E.     The RMLC Is a Cartel of Radio Stations**

54.     RMLC's member stations are competitors.  Yet these "competitors" created and actively participate in a "committee" whose very purpose is to negotiate with PROs as a group and ***destroy*** competition among them in the acquisition of performance license rates.  As RMLC Executive Director, Bill Velez, previously testified:  "We serve as the negotiating arm for the commercial radio industry[.]"  In performing this function, Velez testified, "[t]he overwhelming objective is to keep license fees for the commercial radio industry as low as we can possibly keep them."

55.     The RMLC's member stations are not passive participants in, nor unknowing beneficiaries of, the RMLC's efforts.  The 10,000 radio stations whose interests the RMLC represents are well aware of its anticompetitive purpose and effect.  For example, the RMLC requires its members to affirmatively and expressly authorize the RMLC to negotiate on behalf of all members with PROs.  The RMLC's standard "Authorizations" empower the RMLC to negotiate, on the station's behalf, for a license permitting the station to broadcast copyrighted

musical works, and to take other actions in connection with the negotiations. As an example, the following language is excerpted from an Authorization the RMLC sent to radio stations, which sought their agreement for the RMLC to negotiate licensing fees and other terms with ASCAP, BMI, and SESAC[2] on their behalf:

### AUTHORIZATION

On behalf of the stations(s) named below ("stations"), I hereby authorize the Radio Music License Committee (RMLC) to negotiate with the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music Inc. (BMI), and SESAC for licenses for performance rights necessary and/or appropriate for the stations' conduct of their businesses; to institute or defend in the name of all authorizing stations proceedings to establish reasonable fees and terms for such licenses; and to do all things reasonable and convenient in connection with such negotiations and proceedings. I understand that, by giving this authorization, I agree to be bound by the outcome of any licensing negotiation or proceedings commenced on behalf of authorizing radio stations by the RMLC.

56.     The RMLC touts the fact that it "has been negotiating licenses with PROs on behalf of the radio industry since 1935," that "[a]pproximately 10,000 terrestrial radio stations in the United States are currently licensed in accordance with RMLC-negotiated industry licenses," and that "some 7,300 radio stations are represented by RMLC in pending binding rate arbitration with SESAC."

57.     Participating radio stations are aware of and benefit from the participation of other radio stations in the RMLC's group negotiation conduct. The RMLC draws its negotiating power from the fact that it represents virtually all U.S. radio stations and the stations know and agree with such other stations to negotiate with PROs as a cartel. For example, as shown above, the RMLC's Authorizations state that each participating radio station "agrees[s] to be bound by the outcome of any licensing negotiation or proceedings commenced ***on behalf of authorizing radio stations*** by the RMLC" (emphasis added). In addition to being distributed to the RMLC's thousands of members, the Authorizations may even be posted

---

[2] At the time this Authorization was disseminated, SESAC was not yet subject to judicial or arbitral rate oversight.

publicly (for example, on the RMLC's website).  This widespread dissemination ensures that each member station is aware that all other participating member stations will be bound by these same terms, and agrees to such common restrictions when it executes its own Authorization.

58.    No reasonable radio station would authorize the RMLC to negotiate binding license terms on its behalf without assurances that thousands of other radio stations would also authorize the RMLC to negotiate on their behalf.  The principal reason radio stations agree to have the RMLC negotiate is to harness their collective market power.  By applying that massive leverage, together they achieve better negotiating outcomes than individual stations could by negotiating on their own.

59.    GMR approached RMLC with the explicit purpose of negotiating license fees for its members, and GMR understood in those negotiations that any fee offer would be made available to all participating radio stations.  During these negotiations, the RMLC provided GMR with a "list of the universe of RMLC-represented stations."  That list identified 10,216 individual stations represented by the RMLC.

60.    At all times in its negotiations, the RMLC representatives made clear and GMR understood that any license fee offered to the RMLC would set a ceiling for the rates GMR could obtain with individual radio stations.  In other words, to the extent individual stations have the right or opportunity to opt-out of the rate negotiated by the RMLC, no economically rational radio station would offer to pay more than the rate negotiated by the RMLC.  To the contrary, the rational—but illegal—course is for radio stations to join the cartel and reap the benefit of below-market rates achieved with their collective monopsony power.

61.    In communicating with the thousands of radio stations it represents, the RMLC continually emphasizes its group negotiation efforts, which are known to and authorized by its members.  On November 22, 2016, for example, RMLC Chairman Ed Christian—President and CEO of Saga Communications—informed

radio stations by email that the RMLC would "continue[] negotiations with GMR." The email noted that the RMLC had "negotiated its members' ability to use . . . GMR repertory information to attempt to avoid playing GMR compositions that are not otherwise licensed."   (Of course, unlicensed and therefore infringing performance of the songs in GMR's repertory continues unabated.)   Less than a week later, Mr. Christian again emailed the radio stations, stating that "the RMLC is continuing to explore negotiations with GMR while the litigation goes forward, and we remain committed to achieving the best possible result for the industry."  In these and countless other communications, the commercial radio industry's agreement to negotiate as a group with PROs, through the instrumentality of the RMLC, rings loud and clear.

62.   The RMLC routinely disseminates information to radio stations regarding the status of its PRO negotiations through other means as well.  For example, the RMLC takes advantage of industry conferences (including the annual MFM/BCCA conference, National Association of Broadcasters venues, and various state association events), where its members congregate, to "provide[] information concerning industry license negotiations."   And on at least one occasion, the RMLC's Bill Velez made presentations to several radio industry groups around the country, in which he "listed a lot of these items as goals for the RMLC in our negotiations or litigations with ASCAP and BMI," and "g[a]ve the industry a report card as to how we fared on those particular goals."  One of the goals listed in the presentation was a "substantial fee decrease."  Mr. Velez reported to the radio industry that the RMLC had achieved that objective in the negotiations.

63.   These Authorizations, meetings, presentations, and other communications between the RMLC and its member stations both reflect and constitute direct evidence of the unlawful agreement between and among the RMLC and its member radio stations.  The reality of this horizontal agreement is further evidenced by the fact that the RMLC is controlled and funded by member

stations:  it is primarily comprised of an Executive Committee, the members of which are horizontal competitors.  Each of them owns or manages an RMLC member station or conglomeration of member stations.  These Executive Committee members—whose companies directly compete with one another—negotiate license fees directly with PROs on behalf of their own companies and the RMLC's thousands of members.  According to the RMLC, it exists for the sole purpose of "negotiat[ing] public performance license fees for the benefit of its [radio station] members."[3]  Thus, by their very participation in the RMLC, radio stations are agreeing with the RMLC and each other to negotiate as a cartel.

64.    The RMLC is funded by its members who pay for the privilege of participating in RMLC's efforts to negotiate as a cartel.  Members pay dues based on their size and are subject to assessments when the RMLC undertakes litigation or other efforts on their behalf to lower license fees.

65.    In practice, the RMLC negotiates one template agreement with each PRO on behalf of, and thus binding, all member stations who are party to these tacit and explicit agreements.

66.    The RMLC implicitly and explicitly discourages stations from entering direct agreements with PROs.  In fact, in Mr. Christian's November 22, 2016 email to radio stations, the RMLC expressly recommended that its members **not** agree to GMR's proposed fees.  In his follow-up email on November 28, 2016, Mr. Christian paid lip service to the law, stating that "every broadcaster is free to determine whether the best course for it is to negotiate a license with GMR directly," but then immediately requested that radio stations "keep us in the loop by cc'ing Bill Velez, the RMLC's Executive Director (bill@radiomlc.org), on any communications you have with GMR."  There is no legitimate, pro-competitive reason why a radio station or broadcasting company wishing to negotiate directly

---

[3] Compl. ¶ 11, *Radio Music License Comm., Inc. v. SESAC, Inc., et al.*, No. 2:12-cv-05807-CDJ (E.D. Pa. Oct. 11, 2012) (ECF No. 1).

with GMR should copy the head of the RMLC on "any communications" with GMR, or keep the RMLC "in the loop" on licensing negotiations with GMR.

67.    And, as a practical matter, more than 99% of the RMLC members have participated in and are taking advantage of the RMLC's group rate negotiation conduct.  Only two members have entered an agreement with GMR and just a handful of others have even inquired.  These figures prove the obvious—operating as a cartel ensures the RMLC members they can obtain premium content from copyright holders for exploitative, below-competitive license fees.  By virtue of RMLC member stations' agreement to act as a cartel, negotiating with RMLC Committee or Executive Committee members is equivalent to negotiating with the thousands of radio stations that make up the overwhelming share of a ten-billion-dollar-per-year industry.  As one broadcast industry lawyer has written, "Practically speaking, the RMLC is every broadcaster's agent."  Thus, when a PRO is negotiating with the RMLC, it fully understands it is negotiating with virtually all of the terrestrial radio stations in the United States.   This gives the RMLC tremendous negotiating leverage over PROs.

**F.      The RMLC's Anticompetitive Negotiations with GMR**

68.    Not long after GMR was launched in 2013, it contacted the RMLC to introduce the organization to the RMLC.  As discussed below, when the RMLC made a rate proposal to GMR in the course of negotiations, it was a single fee covering a blanket license for all RMLC radio stations for a year.  GMR made proposals likewise covering all RMLC stations.  RMLC rejected all of GMR's proposals.  GMR has sought to enter direct licenses with individual members of the RMLC.  As of the date of this Complaint, however, only 2 of 3,000 members have agreed to a direct license and only a handful of others have inquired about the possibility of entering a direct license—evidencing the stranglehold the RMLC and its members have over the terrestrial radio airwaves.

69.    At all times, the RMLC held itself out as representing and negotiating

on behalf of its member radio stations.  For example, RMLC's Executive Director Bill Velez told GMR that the RMLC was seeking an "industry-wide licensing arrangement[]" and, as a condition of negotiations, RMLC insisted on a "safe harbor" from infringement claims "to *the radio industry* in the interim."   The RMLC specifically sought to negotiate a price those stations would collectively pay to license GMR's affiliates' copyrighted works.

70.   Another condition of RMLC's was that GMR agree to license all the works in its repertory to every RMLC member, and to submit to binding rate arbitration.  GMR refused this proposal which, again, seeks to dispossess GMR and its songwriters of the ability to negotiate individually with RMLC members.  The RMLC thereby sought to eradicate potential competition among its radio stations for the GMR songs, which might otherwise result in GMR obtaining a market rate for its songwriters.

71.   GMR was forced to attempt direct negotiations with individual RMLC member stations.  However, RMLC members resisted direct deals, and repeatedly instructed GMR to deal with the spokesman of their cartel—the RMLC—instead. To date, GMR has successfully executed direct licensing agreements with only two of the 3,000 RMLC members, and both of these deals took over a year to negotiate.

72.   In September 2016, at the request of individual RMLC members, GMR engaged in discussions with the RMLC.  Here again, the RMLC held itself out as representing all of its members, except those with whom GMR had entered a direct license.  The parties negotiated and executed a Non-Disclosure Agreement which applied to the RMLC members as a whole.  The RMLC requested that GMR make an *industry-wide* licensing fee offer.  Throughout October and November 2016, representatives from the RMLC and GMR met in person, spoke on the phone, and exchanged emails and written proposals.  At all times, the RMLC was seeking to negotiate a single license price on behalf of the vast majority of all U.S. terrestrial radio stations.

73.   When GMR refused to succumb to the RMLC's exploitive offer, the RMLC sued GMR on behalf of all U.S. commercial radio stations.  That lawsuit seeks to prevent GMR from "initiating any legal proceeding against any U.S. commercial radio station for copyright infringement of any portion of GMR's repertory," and seeks a blanket license at a uniform rate to be offered to all U.S. commercial radio stations.[4]

## CONSPIRATORS

74.   Various firms and individuals, not named as defendants in this Complaint, have knowingly participated as conspirators with Defendant RMLC in the violations alleged in this Complaint, and have engaged in acts and made statements in furtherance of the alleged conspiracy.

75.   The RMLC's conspirators include, but are not limited to, the RMLC's Committee and Executive Committee members, and the broadcasting companies they represent; and the owners of the thousands of commercial radio stations who knowingly agree to, directly benefit from, and fund the RMLC's illegal conduct. On information and belief, the RMLC's co-conspirators include, but are not limited to, the Defendants named herein as Does 1 through 3,000, whose identities are not currently known to GMR.

## TRADE AND COMMERCE

76.   The activities of the RMLC and its members and co-conspirators that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.  These activities have had a substantial effect on trade and commerce in the State of California, including within this District.

---

[4] To be clear, GMR is not suing the RMLC because of the RMLC's lawsuit.  To the contrary, as explained throughout this complaint, GMR's lawsuit is premised on RMLC's illegal anticompetitive conduct, including fixing the price of licenses to broadcast copyrighted music on U.S. terrestrial commercial radio stations, group price negotiation, information sharing, and threats of group boycotting.

77.     The RMLC has transmitted Authorizations and contracts to member radio stations across state lines and has communicated with member radio stations by weblog, email, and telephone across state lines.  RMLC employees have traveled across state lines to negotiate with GMR.  Moreover, the RMLC and GMR have conducted negotiations in the State of California, including within this District.

78.     The RMLC member radio stations that purchase services from PROs remit substantial payments across state lines to the RMLC and to the PROs.  In connection with this business, monies, contracts, bills, and other forms of business communication and transactions are transmitted in a continuous and uninterrupted flow across state lines and throughout the State of California, including within this District.

## **RELEVANT MARKET**

### A.     Relevant Product Market

79.     The relevant product market in this case is the market for licenses to broadcast copyrighted music on terrestrial commercial radio stations in the United States.  Terrestrial radio stations operate in different markets than other media service providers such as satellite radio and television, cable music channels, or internet radio services.  According to the U.S. Senate, over-the-air radio programs: (1) are available without subscription; (2) do not rely upon interactive delivery; (3) provide a mix of entertainment and non-entertainment programming and other public interest activities to local communities; (4) promote, rather than replace, record sales; and (5) do not constitute "multichannel offerings of various music formats."  Radio stations have successfully argued they should be exempt from paying statutory performance fees for sound recordings (as distinct from songs) because record labels and performers profit from the free exposure provided by radio airplay.  By contrast, other music sources are regulated by the Copyright Royalty Board and are obligated to pay significant fees for performing sound recordings.  For example, internet radio services pay a substantial  percentage of

their revenue to perform sound recordings.  Terrestrial radio, by comparison, is unique in that it pays no such performance royalties for sound recordings. Terrestrial radio's exemption from paying sound recording performance royalties is evidence of the promotional sword that the industry collectively wields.

80.    Terrestrial radio is also different because of the unique promotional support it affords to songwriters, record labels, and artists.  Radio stations choose a relatively small selection of songs that they broadcast repeatedly.  With consistent rotation of a small number of songs, radio fuels "hit" songs and exposes new music. This is in contrast with the on-demand nature of many other music services where the listener selects what songs she will hear.

81.    Commercial radio stations operate in two-sided markets.  On one side, they seek to attract as many listeners as possible.  On the other, they sell advertising to businesses that wish to reach local listeners.  The more listeners radio stations can attract, the more they can charge for the advertising they sell.    Those commercial radio stations that play music seek to attract listeners by playing music that is popular within a particular genre.

82.    For licensing purposes, radio stations have generally divided themselves into two categories:  (1) those that predominately play music; and (2) those that broadcast other forms of content such as news, talk, or sports. Because they rely on the music they play to attract listeners, music-intensive stations traditionally pay higher license fees than news, talk, or sports radio stations.

83.    The broadcasting of copyrighted music by terrestrial radio is not reasonably interchangeable with other forms of media distribution, such as satellite-based or internet transmission. For one, terrestrial radio is freely available to hundreds of millions of listeners and is their primary source of music and those listeners are not likely to switch to another medium.  By way of example, virtually every car sold in America continues to come pre-installed with an AM/FM radio

and drive time continues to be a major source of radio consumption.  Likewise, an AM/FM clock radio is placed in virtually every hotel and motel room in America. Given the sheer size of the market, from the vantage point of a PRO or copyright holder, there is simply no substitute for broadcasting by terrestrial radio.  For this reason, a decision to forgo public performance licenses to terrestrial radio in the face of a low price is not an economically viable one.  Lost revenues from radio stations cannot be sufficiently recaptured from increased sales to other media.

84.    In some parts of the country, terrestrial radio is the ***only*** effective way for PROs and copyright holders to reach meaningful numbers of consumers. Moreover, terrestrial radio transmission holds certain advantages that potential alternate forms of music distribution do not.  As compared to terrestrial radio antennas, satellite radio antennas are more prone to losing transmission when obstructed by buildings or other structures. And while it is possible to receive local AM/FM radio transmissions at virtually any location in the country, internet-based media (whether live or pre-recorded) can only be accessed when the user is connected to the internet, whether through Wi-Fi, ethernet, or a sufficiently fast mobile phone network.  And there are large pockets throughout the country in which mobile connectivity is unavailable or severely limited.  In addition, local terrestrial radio stations offer unique value to songwriters seeking to promote their live performances or boost sales of their music in a specific geographic area. Although internet media claim to be able to offer localized distribution using geolocation, these services are often unreliable and do not carry the same gravitas as endorsement from a trusted terrestrial radio station, particularly in certain parts of the country.  Because of this, there is low cross-elasticity of demand between the broadcast of copyrighted music by terrestrial radio and the transmission of similar content through other means. If a hypothetical monopsonist in the terrestrial radio broadcasting market were to impose a small but significant non-transitory decrease in licensing fees, significant numbers of copyright holders would not turn to

alternate forms of media distribution as a substitute.

85.    Through a statement by its Chairman, Ed Christian, during a congressional hearing, the RLMC itself has recognized that terrestrial radio is unique among musical content providers—unique in terms of its exposure and unique in terms of its power:

> It's important to distinguish here between pure webcasters (or internet radio), satellite radio, and terrestrial radio. Internet radio does not represent a "free" platform to consumers who need to pay an internet service provider (or "ISP") for access, and who often pay a subscription fee. Satellite radio generally requires the consumer to pay an excess fee as well. Terrestrial radio, on the other hand, is free to the consumer and prides itself on local service to the community. It's critical that Congress judge the local radio industry upon its particular merits alone and not as a comparable to other transmission platforms. It's ironic that within the context of the digital "perfect storm", local radio, which utilizes primarily analog transmissions as the basis for its platform, has been broadly tagged as the problem by stakeholders in the music industry. To be clear -- the only crime that terrestrial radio has committed is to continue to represent the most important promotional tool for songwriters and the recording industry. Otherwise, why would labels and songwriters continue to place a premium on securing terrestrial radio airplay?

**B.    Relevant Geographic Market**

86.    The relevant geographic market in which to assess the anticompetitive effects of the RMLC's conduct is the United States.  The United States is the area of effective competition in which terrestrial radio stations (which are often owned by national or regional parent companies) compete with respect to the negotiation of public performance licenses to copyrighted music, and for the patronage of advertisers.   It is also within the United States that copyright holders may reasonably turn for alternate licensees.   Thus, for example, if a PRO or other copyright holder is unable to find acceptable licensees to broadcast their works in Phoenix, they might reasonably turn to alternative potential licensees in Las Vegas,

1  Seattle, Houston, Atlanta, or Boston.

2      87.   The copyright licenses the RMLC negotiates on behalf of its members
3  are not limited to a particular local geographic area.  They are licenses to perform
4  the copyrighted works in the United States.  When conglomerates with multiple
5  stations such as CBS Radio negotiate for a license, they seek a single license
6  applicable to all their stations across the U.S.

7      88.   Increasingly, radio stations seek licenses that also give them the right
8  to make performances available in digital form over the internet.  Thus, the radio
9  station's content, including the performance of copyrighted works, can be heard
10  over the internet throughout the United States.

11      89.   That the relevant market is national in scope is, in part, a function of
12  radio regulation in the United States.  Since 1910, terrestrial radio in the United
13  States has been regulated at the national level—first by the Federal Radio
14  Commission, and subsequent to the passage of the Communications Act in 1934, by
15  the Federal Communications Commission ("FCC").  The FCC is responsible for the
16  allocation of broadcast spectrum, and the associated licensing of radio broadcast
17  stations.  The FCC has no jurisdiction to license radio stations outside of the United
18  States' boundaries, and nor do foreign authorities (such as the Canadian
19  Radio-Television and Telecommunications Commission) have authority to license
20  radio stations within the United States.  In other words, the FCC oversees a national
21  (but not international) market for terrestrial radio broadcasting.  Because other
22  countries employ different regulatory systems for terrestrial radio, and have enacted
23  different laws governing copyright protection, licensing, and public performances,
24  PROs and other copyright holders are unlikely to turn to potential alternative
25  licensees beyond U.S. borders if they are unable to find satisfactory licensees
26  within the United States.

27      90.   Because of these factors, there is low cross-elasticity of demand
28  between the broadcast of copyrighted music by terrestrial radio within the United

- 27 -

States and the broadcast of similar content by terrestrial radio outside of the United States.  If a hypothetical monopsonist in the U.S. terrestrial radio broadcasting market were to impose a small but significant non-transitory decrease in licensing fees, significant numbers of copyright holders would not turn to terrestrial radio broadcasters outside of the United States as a substitute.

## **THE RMLC'S MARKET POWER**

91.    The RMLC has market power in the relevant market.

92.    By its own admission, the RMLC negotiates licenses on behalf of the vast majority of commercial terrestrial radio stations in the United States.  The 10,000 commercial radio stations the RMLC represents collectively account for approximately 90% of revenues in the relevant market.  On information and belief, the vast majority of these 10,000 radio stations participate in, and benefit from, the RMLC's group negotiation and price-fixing conduct.  Thus, PROs or songwriters that want to license their songs to be played on terrestrial radio in the United States effectively have no choice but to deal with the RMLC.  While some of the larger radio station conglomerates may directly negotiate with PROs for licenses, the vast majority of stations—particularly small, unaffiliated stations that may represent the best media outlet for accessing certain parts of the country—participate in the RMLC's group negotiation and price-fixing conduct.

93.    Another indication of the RMLC's market power is its ability to obtain lower prices on behalf of the radio stations it represents.

94.    For example, in 2008, the RMLC negotiated licenses with fixed fees with ASCAP and BMI.  But when the U.S. economy sank into a recession and radio stations' advertising revenues slumped, the RMLC complained radio stations were paying too much for those licenses.

95.    As the recession deepened, the RMLC's member stations became unhappy with the deal they had struck.  The lack of a relationship between fixed license fees and gross revenues caused license fees to go from 1.7% to

approximately 3% of industry revenues for each of ASCAP and BMI in the post-2008 environment.  Although the radio stations were bound to a five-year contract, the RMLC was able to use its market power to renegotiate the terms of the agreements it had previously signed. The RMLC effectively rolled back the annual industry fees that radio stations paid ASCAP by more than $80 million for the year 2012 (relative to where the fees stood at the time the prior license terminated in 2009).  The RMLC also obtained a return to a revenue-based fee structure at a level of 1.7% of revenue.  In addition, the new agreement RMLC obtained covers the range of new media platforms in which the radio industry is increasingly engaged, such as platforms related to internet websites, smart phones, and other wireless devices.  In other words, the RMLC was able to exploit its market position to obtain a *broader* license in return for a *lower* share of radio stations' revenues.

96.    The RMLC is in active negotiations with SESAC.  In a recent communication to its members about those negotiations, the RMLC encouraged the radio stations—the cartel—to hold tight and stick together, because the RMLC expected to reduce SESAC's rates with the industry by more than 50%.  With this letter, the RMLC discouraged its members from entering into direct deals with SESAC, and made sure that any such direct deals would be at or below the price fixed by the cartel.

**B.    Barriers to Entry**

97.    There are significant barriers to entry in the relevant market.  These entry barriers help the RMLC and its members to maintain its market power in the relevant market.

98.    In a monopsony market, "switching barriers" refers to the costs to a seller of switching from a monopsony buyer to a new entrant buyer.  Switching barriers are the economic equivalent of barriers to entry in the monopoly context.

99.    Here, a new entrant looking to enter the market for purchasing radio station public performance licenses must achieve sufficient scale—that is, represent

- 29 -

sufficient radio stations—so that it can effectively compete.  But radio stations will have no incentive to aggregate their buying power with a new entrant if that entrant does not have more bargaining power with PROs than does the RMLC or the radio station itself, acting individually.  Amassing that many radio stations will be very difficult for a new entrant, since the costs of switching from the RMLC to a new entrant include the court-mandated fee to fund the RMLC's operations, which radio stations pay regardless of whether or not they are members of the RMLC.  A station will thus be less inclined to switch to a competitor of the RMLC but keep funding the RMLC's operations.

100.   Without such a court-ordered assessment, a new entrant will also need to fund its own operations, putting it at a competitive disadvantage with the RMLC in terms of costs.

101.   The RMLC enters into licensing agreements with PROs that carry five-year terms.  These multi-year terms also contribute to switching costs, since sunk licensing costs will often exceed the benefits of switching during the first few years of the licensing term.  This can make radio stations more reluctant to switch to a different licensing agreement (for example, a direct licensing deal with a PRO) before their existing licenses are nearing termination.

## C.   Barriers to Short-Term Increases in Consumption

102.   Because this case involves price collusion by radio station **purchasers** rather than by widget producers, the relevant "output" is **consumption** by terrestrial radio stations of the product at issue—*i.e.*, licenses to copyrighted music—rather than the production of it.[5]  The RMLC has market power because in the event the RMLC stations do not buy licenses from GMR, non-RMLC member radio stations

---

[5] As the Tenth Circuit has explained, while collusive suppliers "utilize market power to **restrict output** and thereby raise prices," collusive purchasers with market power "**decrease market demand** for a product and thereby lower prices." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (emphasis added).

1  will not increase their license purchases permitting GMR to shift its output to those

2  stations.   A single license allows the radio station to play a particular song as many

3  times as it wishes during the license period.   So when a radio station obtains from

4  GMR the right to perform *Imagine*, it does not need to—and would have no

5  incentive to—purchase another license to perform publicly the same song.   No

6  radio station would purchase multiple blanket licenses from the same PRO, even if

7  licensing fees are severely depressed.

8      103.  Therefore, if a monopsonist or group buying cartel suppresses prices

9  and demand for performance licenses to copyrighted music, other existing radio

10  stations would have absolutely no reason to—and, in fact, will not—increase their

11  consumption of those licenses in the short run (or indeed in the long run).   This

12  dynamic supports and helps to perpetuate the RMLC's power in the relevant

13  market.

14              **THE RMLC'S ANTICOMPETITIVE CONDUCT**

15  **A.    The Antitrust Laws Apply to Agreements Among Buyers**

16      104.  Buyers   as   well   as   sellers   may   violate   the   antitrust   laws.

17  "Conceptually, monopsony power is the mirror image of monopoly power."   U.S.

18  Dep't of Justice Antitrust Div. & Fed. Trade Comm'n, *Improving Health Care: A*

19  *Dose of Competition* 13 (2004).   As Judge Posner has explained, "[j]ust as a sellers'

20  cartel enables the charging of monopoly prices, a buyers' cartel enables the

21  charging of monopsony prices; and monopoly and monopsony are symmetrical

22  distortions of competition from an economic standpoint."   *Vogel v. Am. Soc'y of*

23  *Appraisers,* 744 F.2d 598, 601 (7th Cir. 1984).   And as the Supreme Court has

24  recently recognized, similar legal standards apply to these same basic economic

25  principles.  *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549

26  U.S. 312, 321-22 (2007) (noting the "close theoretical connection between

27  monopoly and monopsony" and that "[t]he kinship between monopoly and

28  monopsony suggests that similar legal standards should apply to claims of

monopolization and to claims of monopsonization").

105.  The RMLC's sole mission is to negotiate license fees.  According to guidelines jointly promulgated by the Department of Justice and Federal Trade Commission that mission is not legitimate, but is a *per se* antitrust violation.  The antitrust agencies explained: "An agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a *per se* antitrust violation. Legitimate joint purchasing arrangements provide some integration of purchasing functions to achieve efficiencies."  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Healthcare* 54 n.17 (Aug. 1996) [hereinafter "*Healthcare Statements*"].

106.  A buyers' cartel forces sellers to accept prices below what those sellers would receive in a competitive market, or that are otherwise not explained by sellers' efficiencies, because the cartel members collectively exercise market power.  *See, e.g.*, *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1134-36 (10th Cir. 2002).  Just as the collective exercise of seller-side market power absent sufficient countervailing efficiencies will violate Section 1 of the Sherman Act, the Act prohibits the collective exercise of buyer-side monopsony power.

**B.    RMLC Member Stations Have Engaged in Additional Anticompetitive Conduct in Furtherance of Their Conspiracy**

107.  The antitrust agencies have observed that "the likelihood of anticompetitive communications is lessened where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants."  *See Healthcare Statements* at 57.

108.  The RMLC defies that directive frequently.  As just one example, the RMLC issued an open letter to its members on October 28, 2015 regarding an

ongoing rate arbitration with SESAC. In this letter, the RMLC informed its member stations that "reasonable fees bargaining [with SESAC] should be set at half or less than current levels," and that it anticipated achieving this specific rate amount. The RMLC further noted that an individual member's decision to pay SESAC higher rates would "undercut the RMLC's ability to vigorously represent our industry." This letter and directive is a smoking gun. It clearly signaled to the RMLC's co-conspirator stations the level at which the price for a SESAC license had been fixed. In this way, the RMLC and its affiliates could be sure that even stations that opted to deal directly with SESAC would not undermine the cartel's objective of suppressing the license fees paid to SESAC to a fixed level.

## C. RMLC Member Stations' Conduct Has Had Anticompetitive Effects in the Market that Are Not Outweighed by or Necessary to Achieve a Procompetitive Purpose

109. Though lower prices may not appear to cause harm to competition, when they are the result of an agreement among competitors with market power, they are *per se* illegal and clearly harm competition and consumer welfare. RMLC member stations have agreed to reduce competition among themselves and thereby increase their own profits, all at the expense of overall economic efficiency and consumer welfare. The lower prices their collusion yielded have not been passed on to consumers in any form. Radio is not made better because the conspiring radio stations pay less to the people who create music. Instead, consumers will be harmed by the reduced incentives for innovation resulting from suppressing the amount a songwriter can command for use of their copyrighted work. Absent the agreement among the RMLC and the radio stations, greater innovation could be rewarded by allowing songwriters and PROs to negotiate for license fees determined by the market value of the fruits of that innovation. The RMLC member stations' conspiracy stifles this and prevents the market from determining the most efficient, consumer-welfare-maximizing result.

110. A group purchasing organization that, like the RMLC, is designed to

1  support a price fixing conspiracy is a *per se* antitrust violation.   But even if the

2  RMLC member stations' price-fixing conduct were not *per se* illegal, it would still

3  violate Section 1 of the Sherman Act and the California Cartwright Act under the

4  antitrust "rule of reason" because the anticompetitive effects of that conduct far

5  outweigh any procompetitive benefits.

6  111.   The antitrust agencies' *Healthcare Statements* set forth a market-share

7  focused framework for group buying organizations, under which anticompetitive

8  effects are more likely where "the arrangement accounts for so large a portion of

9  the purchases of a product or service that it can effectively exercise market power

10  in the purchase of the product or service."   *Healthcare Statements* at 53.   The

11  statement provides a "safe harbor" for joint purchasing organizations with a 35%

12  market share. *Id.* at 54-55.

13  112.   The RMLC, which negotiates on behalf of radio stations accounting

14  for more than 90% of the industry's revenues, significantly exceeds this "safe

15  harbor" threshold.

16  113.   In addition, the RMLC has unique access to the vast majority of

17  terrestrial radio stations.   These stations are a business element necessary for the

18  songwriters GMR represents because, as discussed above, while other media

19  avenues exist through which GMR songwriters make their music available to the

20  public, terrestrial radio remains the most important promotional medium for GMR

21  songwriters.

22  114.   Under the *Healthcare Statements*, the RMLC is more likely to have

23  anticompetitive effects because the RMLC Executive Committee members who

24  negotiate on behalf of the RMLC are not independent, but employees of RMLC

25  member radio stations.   *See Healthcare Statements* at 57 ("where negotiations are

26  conducted on behalf of the joint purchasing arrangement by an independent

27  employee or agent who is not also an employee of a participant, antitrust risk is

28  lowered").

115. The RMLC's open information exchanges with its members also increase the risk of anticompetitive effects. *See id.* (antitrust risk lowered "where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants.").

116. While the RMLC raises serious anticompetitive concerns, there is no countervailing consumer benefit.

## ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

117. As a direct and proximate cause of the RMLC's and its co-conspirators' unlawful actions, competition has been substantially foreclosed in the market for licenses to the broadcast of copyrighted music by terrestrial commercial radio stations in the United States. The RMLC eliminates the competition that would otherwise exist—and which should exist—between 10,000 commercial radio stations that constitute the vast majority of purchasers in the relevant market. By operating as a group buying cartel with an extraordinarily high degree of monopsony power, the RMLC and its constituent stations artificially suppress demand for licenses, and the music licensing fees paid to PROs and copyright holders, below competitive levels.

118. This elimination of competition, and the resulting decrease in demand and pricing for performance licenses, in turn reduces the output of high-quality music that benefits consumers. As the Supreme Court has stated, copyright law is founded on the principle that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219 (1954). It is the copyright holder's right to that "reward"—a reasonable and competitive royalty—that "serves to induce release to the public of the products of his creative genius." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 158 (1948)). The copyright system therefore "promotes consumer welfare in the long term by

encouraging investment in the creation of desirable artistic and functional works of expression." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1328-29 (Fed. Cir. 2000) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186-87 (1st Cir. 1994)).  By artificially suppressing demand and prices for licenses to perform songwriters' musical works, the RMLC cartel eviscerates the economic incentive these songwriters have to create and publish new creative works for the consuming public's benefit.  The RMLC's collusive conduct has therefore reduced, and will continue to reduce, the output of high-quality musical compositions.

119.  Moreover, the RMLC's artificial suppression of demand and prices for licenses to copyrighted music results in pricing that is below the actual value of the compositions—and, in some instances, could be below the marginal cost of producing high-quality musical compositions in the first place.  Not only does this diminish songwriters' incentives to create more musical works in the future, it results in unnecessary waste of existing resources, leading to allocative inefficiencies.  As the Ninth Circuit states, "[c]onsumer welfare is maximized when economic resources are allocated to their best use." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

120.  GMR has been injured in its business and property as a direct and proximate result of the competition-reducing aspects or effects of the RMLC's and its co-conspirators' unlawful conduct.  In particular, by operating as a cartel, the RMLC and its members substantially eliminate competition among terrestrial radio stations in the negotiation of licensing terms and royalty rates.  The RMLC's group price-setting and negotiation artificially suppress licensing fees to the songs in GMR's repertory below competitive levels, such that the price-fixed licensing fees the RMLC insists upon do not correspond to the actual value of the works in GMR's repertory.  The anticompetitive suppression of prices is widely recognized to constitute actionable antitrust injury. *See W. Penn Allegheny Health Sys., Inc. v.*

*UPMC*, 627 F.3d 85, 103-05 (3d Cir. 2010) (healthcare system adequately alleged "antitrust injury in the form of artificially depressed reimbursement rates"); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1134 (10th Cir. 2002) (holding that injury to sellers as a result of monopsonistic behavior constitutes antitrust injury); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-88 (9th Cir. 2000) (plaintiff milk suppliers adequately alleged antitrust injury due to "artificially depressed milk prices"). Moreover, by refusing to deal with GMR except upon the anticompetitive terms the RMLC cartelists agree to, the RMLC forces GMR to either accept below-competitive rates or forgo licensing revenue altogether. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1158 (5th Cir. 1979) ("In the monopsony or oligopsony price-fixing case, however, the seller faces a Hobson's choice: he can sell into the rigged market and take the depressed price, or he can refuse to sell at all."); *see also Blue Shield of Va. v McCready*, 457 U.S. 465, 483 (1982) (forcing health plan subscriber to choose between two injurious options— "visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice"—constituted antitrust injury). The licensing revenue GMR has lost as a direct result of the RMLC's anticompetitive price-fixing and refusals to deal constitutes antitrust injury.

## COUNT I

## (CONSPIRACY IN RESTRAINT OF TRADE – SHERMAN ACT SECTION 1)

121. GMR incorporates its allegations in paragraphs 1-120 as if fully stated herein.

122. Beginning no later than 2013, and continuing to date, Defendant and its co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This offense is likely to continue and recur unless the relief requested is granted.

123.   The conspiracy and agreement consist of an understanding and concert of action among the RMLC and its co-conspirators to lower, fix, and control copyright license fees, to avoid price competition among radio stations, and to limit price competition among the RMLC's radio station members, ultimately effectuated by collectively adopting and adhering to functionally identical license agreements and fee schedules.

124.   For the purpose of forming and effectuating this agreement and conspiracy, some or all of the RMLC and its co-conspirators did the following things, among others:

a.   shared their business information, plans, and strategies in order to formulate ways to lower copyright license fees;

b.   assured each other of support in attempting to lower copyright license fees, and the specific rates to which they would lower them;

c.   employed ostensible trade association meetings to further support their attempts to lower copyright license fees;

d.   fixed the method of and formulas for setting copyright license fees; and

e.   fixed prices for copyright license fees.

125.   Defendant RMLC and its co-conspirators entered into this conspiracy and agreement with the intent to harm or restrain interstate trade or commerce in the relevant market.

126.   Defendants' conspiracy and agreement, in which the RMLC and its member stations agreed to lower, fix, and control copyright license fees, and thereby prevent price competition among radio stations, constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.   Moreover, Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on composers and publishers in the copyright-protected music market by depriving them of the benefits of

competition among radio stations as to both copyright license fees and other innovations, such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

128. Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this complaint is copyright licenses purchased by terrestrial radio stations. The anticompetitive acts at issue in this case directly affect the purchase of copyright licenses by terrestrial radio stations. No reasonable substitute exists for copyright licenses purchased by terrestrial radio stations. For composers and publishers, there is no substitute for terrestrial radio stations as a means of reaching a sizeable population of potential new listeners. Without terrestrial radio stations, songwriters and publishers of copyrighted songs would be unable to reach many potential new listeners. Terrestrial radio stations are viewed as separate from other ways of distributing and performing copyrighted music, and copyright licenses sold to terrestrial radio stations constitute a separate market segment from all other copyright license purchasers. The RMLC and its co-conspirators were able to impose and sustain significant license fee decreases for the copyright licenses they purchase.

129. The relevant geographic market is the United States. The rights to license copyrights are granted on territorial bases, with the United States typically forming its own territory. Radio stations typically present a unique medium to U.S. consumers and foreign terrestrial radio stations' signals cannot typically be heard in the United States.

130. Collectively, the RMLC's members possess market power in the market for copyright license fees paid by terrestrial radio stations. The RMLC successfully imposed and sustained a significant fee reduction in the license fees

paid to the two largest PROs, ASCAP and BMI.  Collectively, the RMLC's members represent virtually all the terrestrial radio stations in the United States. The RMLC's negotiated license fee agreements are adopted by the vast majority of U.S. commercial radio stations.  Music composers and publishers cannot profitably forgo the sale of copyright licenses to the RMLC's member stations.

131.  Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

a.  lowering the copyright license fees paid by terrestrial radio stations;

b.  eliminating competition on copyright license fees among terrestrial radio stations;

c.  restraining competition on copyright license fees paid by the RMLC's members;

d.  making more likely express or tacit collusion among radio stations;

e.  reducing competitive pressure on copyright licenses; and

f.  discouraging creative and musical innovation by failing to provide appropriate financial incentives for such innovation.

132.  Defendants' agreement and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

133.  Defendants' agreement already has caused significant financial damage and will continue to cause substantial financial damage to GMR because GMR has made money guarantees to its songwriters that were to be funded, in part, by license fees paid by RMLC members after a negotiation in the free market.  The RMLC's agreement and exercise of monopsony power has reduced and/or eliminated the license fees paid by RMLC members.

**COUNT II**

**(VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT)**

134.  GMR incorporates its allegations in paragraphs 1-133 as if fully stated herein.

135.  The RMLC's and its co-conspirators' contract, combination, trust, and conspiracy has been substantially carried out and effectuated within the State of California.  Many commercial radio stations in California entered into agreements with the RMLC and one another to negotiate with PROs as a cartel, suppress and eliminate competition in the relevant market, and reduce demand and depress prices for licenses to broadcast copyrighted music by terrestrial radio in California.  The RMLC held direct discussions and negotiations with GMR, which is based in Los Angeles.  At the single in-person meeting to discuss substantive counterproposals, representatives of the RMLC met with representatives of GMR at GMR's office in Los Angeles.

136.  The purpose of the RMLC's and its co-conspirators' contract, combination, trust, and conspiracy is to unreasonably restrain trade in the market for licenses to broadcast copyrighted music on terrestrial radio in the United States, including within California.  In particular, the RMLC and its co-conspirators agreed and intend to lower, fix, and control copyright license fees; avoid price competition among radio stations; and limit price competition among the RMLC's member stations.  The RMLC's member stations have effectuated these ends by collectively adopting and adhering to functionally identical license agreements and fee schedules.

137.  For the purpose of forming and effectuating this contract, combination, trust, and conspiracy, some or all of the RMLC and its co-conspirators did the following things, among others:

> a.   shared their business information, plans, and strategies in order to formulate ways to lower copyright license fees;

     b.     assured each other of support in attempting to lower copyright license fees, and the specific rates to which they would lower them;

     c.     employed ostensible trade association meetings to further support their attempts to lower copyright license fees;

     d.     fixed the method of and formulas for setting copyright license fees; and

     e.     fixed prices for copyright license fees.

138.   Defendant RMLC and its co-conspirators entered into this contract, combination, trust, and conspiracy with the intent to harm or restrain interstate trade or commerce in the relevant market, including within the State of California.

139.   Defendants' contract, combination, trust, and conspiracy, in which the RMLC and its member stations agreed to lower, fix, and control copyright license fees, to prevent price competition among radio stations by fixing copyright license fees, constitutes a *per se* violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720.

140.   Moreover, Defendants' contract, combination, trust, and conspiracy has resulted in obvious and demonstrable anticompetitive effects on composers and publishers in the copyright-protected music market by depriving them of the benefits of competition among radio stations as to both copyright license fees and other innovations, such that it constitutes an unreasonable restraint on trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720.

141.   Where, as here, Defendants have engaged in a *per se* violation of the Cartwright Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this complaint is copyright licenses purchased by terrestrial radio stations.   The anticompetitive acts at issue in this case directly affect the purchase of copyright

licenses by terrestrial radio stations.  No reasonable substitute exists for copyright licenses purchased by terrestrial radio stations.  For composers and publishers, there is no substitute for terrestrial radio stations for reaching a sizeable population of potential new listeners and without terrestrial radio stations, songwriters and publishers of copyrighted songs would be unable to reach many potential new listeners.  Terrestrial radio stations are viewed as separate from other ways of distributing and performing copyrighted music, and copyright licenses sold to terrestrial radio stations is a separate market segment from all other copyright license purchasers.  The RMLC and its co-conspirators were able to impose and sustain significant license fee decreases for the copyright licenses they purchase.

142.  The relevant geographic market is the United States, which includes the State of California.  The rights to license copyrights are granted on territorial bases, with the United States typically forming its own territory.  Radio stations typically present a unique medium to U.S. consumers and foreign terrestrial radio stations signals cannot typically be heard in the United States.

143.  Collectively, the RMLC's members possess market power in the market for copyright license fees paid by terrestrial radio stations.  The RMLC successfully imposed and sustained a significant fee reduction in the license fees paid to the two largest PROs, ASCAP and BMI.  Collectively, the RMLC's members represent virtually all the terrestrial radio stations in the United States.  The RMLC's negotiated license fee agreements are adopted by the vast majority of U.S. commercial radio stations.  Music composers and publishers cannot profitably forgo the sale of copyright licenses to the RMLC's member stations.

144.  Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

        a.     lowering the copyright license fees paid by terrestrial radio stations;

        b.     eliminating competition on copyright license fees among

terrestrial radio stations;

c.    restraining competition on copyright license fees paid by the RMLC's members;

d.    making more likely express or tacit collusion among radio stations;

e.    reducing competitive pressure on copyright licenses; and

f.    discouraging creative and musical innovation by failing to provide appropriate financial incentives for such innovation.

145.  Defendant's contract, combination, trust, and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

146.  On information and belief, the RMLC represents hundreds of California radio stations in negotiating licensing terms and fees with PROs, including GMR.

147.  The RMLC's and its co-conspirators' illegal and anticompetitive conduct has caused significant adverse effects on trade and commerce in the State of California, including within this District.  In particular, the RMLC's cartel behavior has substantially foreclosed competition among commercial radio stations for licenses to broadcast copyrighted music on terrestrial radio in the State of California; suppressed demand for licenses to broadcast copyrighted music on terrestrial radio in the State of California; and depressed below competitive levels fees for licenses to broadcast copyrighted music on terrestrial radio in the State of California.  Moreover, as a direct and proximate result of the RMLC's and its co-conspirators' conduct, songwriters, composers, and music publishers in California have been unfairly and inadequately compensated for the use of their copyrighted works.  By undermining the incentives for songwriters, composers, and music publishers to create and publish new creative works, the RMLC has deprived California consumers of additional creative works.

148. As a direct and proximate result of the RMLC's and its co-conspirators' illegal and anticompetitive conduct, GMR has sustained damages within California. GMR is headquartered in Los Angeles, California, and substantially all of its employees and property are based in Los Angeles. The RMLC's cartel behavior has suppressed demand for licenses to the high-value, premium content in GMR's repertory, and depressed fees for licenses to that content below competitive levels.

149. Furthermore, as a direct and proximate result of Defendants' conduct, GMR has been damaged because GMR has made money guarantees to its songwriters that were to be funded, in part, by license fees paid by RMLC members after a negotiation in the free market. The RMLC's agreement and wrongful conduct has reduced and/or eliminated the license fees paid by RMLC members.

## COUNT III
## (VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW)

150. GMR incorporates its allegations in paragraphs 1-149 as if fully stated herein.

151. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, defines "unfair competition" to include any unlawful business practices. The RMLC's and its co-conspirators' conduct as alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720, among other laws.

152. A substantial portion of the underlying conduct and events alleged herein occurred in California. Many commercial radio stations in California entered into agreements with the RMLC and one another to negotiate with PROs as a cartel, suppress and eliminate competition in the relevant market, and reduce demand and depress prices for licenses to broadcast copyrighted music on terrestrial radio in California. The RMLC held direct discussions and negotiations with GMR, which is based in Los Angeles. Representatives of the RMLC also met with

1    representatives of GMR, in person, at GMR's office in Los Angeles.

2        153.  On information and belief, the RMLC represents hundreds of
3    California radio stations in negotiating licensing terms and fees with PROs,
4    including GMR.

5        154.  The RMLC's and its co-conspirators' illegal and anticompetitive
6    conduct has caused significant adverse effects on commerce in the State of
7    California, including within this District.  In particular, the RMLC's cartel behavior
8    has substantially foreclosed competition among commercial radio stations for
9    licenses to broadcast copyrighted music on terrestrial radio in the State of
10   California; suppressed demand for licenses to broadcast copyrighted music on
11   terrestrial radio in the State of California; and depressed fees for licenses to
12   broadcast copyrighted music on terrestrial radio in the State of California below
13   competitive levels.  Moreover, as a direct and proximate result of the RMLC's and
14   its co-conspirators' conduct, songwriters, composers, and music publishers in
15   California have been unfairly and inadequately compensated for the use of their
16   copyrighted works.  By undermining the incentives for songwriters, composers, and
17   music publishers to create and publish new creative works, the RMLC has deprived
18   California consumers of additional creative works.

19       155.  As a direct and proximate result of the RMLC's and its
20   co-conspirators' illegal and anticompetitive conduct, GMR has sustained economic
21   injury, *i.e.*, lost money or property, within California.  GMR is headquartered in
22   Los Angeles, California, and substantially all of its employees and property are
23   based in Los Angeles.  The RMLC's cartel behavior has suppressed demand for
24   licenses to the high-value, premium content in GMR's repertory, and depressed fees
25   for licenses to that content below competitive levels.

26       156.  As a direct and proximate result of the RMLC's and its co-
27   conspirators' illegal and anticompetitive conduct, the thousands of radio stations
28   the RMLC represents—including the hundreds of stations that, on information and

belief, reside in California—have been unjustly enriched in an amount to be determined at trial.

157.  Unless enjoined, the RMLC's unlawful conduct will continue and cause further injury to GMR.  GMR will continue to suffer injury for which there is no adequate remedy at law.

158.  GMR therefore seeks equitable and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203, to correct for the injurious and anticompetitive effects caused by the RMLC's unlawful conduct, and other relief so as to assure that such conduct does not continue or reoccur in the future.

**JURY DEMAND**

159.  Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, GMR requests that the Court enter judgment in its favor and against Defendant for:

    a.  adjudge and decree that Defendant and its co-conspirators' agreements not to compete constitute illegal restraints of interstate trade and commerce in violation of Section 1 of the Sherman Act;

    b.  adjudge and decree that Defendant and its co-conspirators' agreements not to compete constitute illegal trusts and combinations in violation of the California Cartwright Act;

    c.  adjudge and decree that Defendant and its co-conspirators' agreements not to compete constitute unfair business practices in violation of the California Unfair Competition Law;

    d.  enjoin and restrain Defendant and its co-conspirators from enforcing or adhering to existing agreements that unreasonably restrict competition for copyright licenses;

    e.  permanently enjoin and restrain Defendant and its co-conspirators from establishing any similar agreement unreasonably restricting

1    competition for copyright licenses except as prescribed by the Court;

2    f.   award the GMR such other relief as the Court may deem just and

3    proper to redress and prevent recurrence of the alleged violations and

4    to dissipate the anticompetitive effects of the illegal agreements

5    entered into by the RMLC and its co-conspirators;

6    g.   actual damages in an amount to be determined at trial;

7    h.   treble damages;

8    i.   reasonable attorneys' fees and costs;

9    j.   punitive damages; and

10   k.   such other relief as the Court deems just and proper.

11

12   Dated: December 6, 2016                    Respectfully submitted,

13

14                                              /s/ Daniel M. Petrocelli

15                                              _____

16

17

18

19

20

21

22

23

24

25

26

27

28