1   MAKAN DELRAHIM
      Assistant Attorney General
2
    MICHAEL F. MURRAY
3     Deputy Assistant Attorney General

4   DANIEL E. HAAR
        (daniel.haar@usdoj.gov)
5   MARY HELEN WIMBERLY
        (maryhelen.wimberly@usdoj.gov)
6     Attorneys

7   U.S. Department of Justice
    Antitrust Division
8   Appellate Section
    950 Pennsylvania Avenue, N.W.
9   Room 3224
    Washington, D.C. 20530-0001
10  Telephone:  (202) 514-4510
    Facsimile:  (202) 514-0536
11  Counsel for the United States of America

12                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
13                       WESTERN DIVISION

14  GLOBAL MUSIC RIGHTS, LLC,

15                              Plaintiff,        No. 2:16-cv-9051-TJH(ASx)

16                vs.                             STATEMENT OF INTEREST
                                                  OF THE UNITED STATES
17  RADIO MUSIC LICENSE
    COMMITTEE, INC. et al.,                       The Honorable Terry J. Hatter, Jr.

18                              Defendants.       Under Submission
                                                  September 9, 2019
19

20

21

22

23

24

1

2

**TABLE OF CONTENTS**

Page

Interest of the United States ......................................................................................1

Statement.....................................................................................................................1

Argument.....................................................................................................................2

I. Agreements Among Buyers To Violate The Antitrust Laws Are Just As
   Pernicious As Agreements Among Sellers......................................................2

II. Certain of RMLC's Arguments Misstate The Law On Buyers' Price-Fixing
    Agreements And Should Be Rejected .............................................................5

   A. Intent...........................................................................................................6

   B. Price Fixing ...............................................................................................7

      1. Categorization of Alleged Restraint ..................................................8

      2. Agreement as to Third-Party Price Setting .....................................11

   C. Success of Conspiracy.............................................................................12

Conclusion ...............................................................................................................14

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

i

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998)............................................................................10

*Arizona v. Maricopa Cty. Med. Soc'y*,
   457 U.S. 332 (1982) ......................................................................................2, 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................6

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ...........................................................................................3

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ...........................................................................................6

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
   637 F.2d 105 (3d Cir. 1980)...............................................................................6

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) ................................................................................ 8, 9, 10

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015)........................................................................6, 7

*Kendall v. VISA U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)............................................................................7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)..........................................................................5, 11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................................................3, 6

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989)..............................................................................7

*Liu v. Amerco*,
   677 F.3d 489 (1st Cir. 2012) ............................................................................12

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948) ...........................................................................................4

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ...........................................................................................6

*N. Pac. Ry. v. United States*,
   356 U.S. 1 (1958) .......................................................................................2, 3, 7

*Nash v. United States*,
    229 U.S. 373 (1913) ..................................................................................13

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990) ....................................................................................3

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ..................................................................3

*The Fair v. Kohler Die & Specialty Co.*,
    228 U.S. 22 (1913) ..................................................................................10

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) ...........................................................................3

*United States v. Alston*,
    974 F.2d 1206 (9th Cir. 1992) ...................................................................7

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ...................................................................4

*United States v. Hayter Oil Co.*,
    51 F.3d 1265 (6th Cir. 1995) ...................................................................13

*United States v. Joyce*,
    895 F.3d 673 (9th Cir. 2018) ...........................................................3, 4, 7

*United States v. Mfrs.' Ass'n of Relocatable Bldg. Indus.*,
    462 F.2d 49 (9th Cir. 1972) .......................................................................3

*United States v. SKW Metals & Alloys, Inc.*,
    195 F.3d 83 (2d Cir. 1999) ......................................................................13

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ................................................................ 5, 7, 8, 12, 13

*United States v. Trenton Potteries Co.*,
    273 U.S. 392 (1927) ..................................................................................8

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) ..................................................................................4

**STATUTES:**

15 U.S.C. § 1 ................................................................................... 1, 2, 13

28 U.S.C. § 517 ...............................................................................................1

**OTHER AUTHORITY:**

George J. Stigler, *A Theory of Oligopoly*,
    72 J. Pol. Econ. 44 (1964) ........................................................................9

1              **INTEREST OF THE UNITED STATES**

2        The United States submits this Statement pursuant to 28 U.S.C. § 517, which

3    permits the Attorney General to direct any officer of the Department of Justice to

4    attend to the interests of the United States in any case pending in a federal court.

5        The United States enforces the federal antitrust laws and has a strong interest in

6    their correct application.  Competitors' naked agreements to fix prices are one of the

7    most pernicious forms of anticompetitive restraints that violate Section 1 of the

8    Sherman Act, 15 U.S.C. § 1.  Private, civil enforcement is an important supplement to

9    the United States' efforts to eliminate these unlawful practices, so long as that

10   enforcement is consistent with the law.

11       The present case involves an alleged buyers' cartel—a form of cartel that can be

12   equally destructive of competition as a sellers' cartel, even though it is discussed less

13   frequently in the case law.  Because of this disparity, the United States offers this

14   Statement to describe the legal standards governing whether an alleged agreement

15   among buyers constitutes a per se illegal restraint of trade in violation of Section 1.

16   This Statement assumes the truth of the allegations of the complaint in its analysis, as

17   is required on a motion for judgment on the pleadings.  The United States takes no

18   position on the truth of the facts alleged.

19                    **STATEMENT**

20       This case concerns music licensing.  According to the operative complaint,

21   Global Music Rights, LLC (GMR) is a performing rights organization (PRO) that

22   aggregates the public-performance rights of its affiliated songwriters and sells licenses

23   bundling together those rights.  1st Am. Compl. ¶ 4 (Dkt. No. 23).  GMR offers

24   licenses to a wide variety of buyers, including owners of commercial terrestrial (AM

                                1

1   or FM) radio stations.  *Id.* ¶¶ 4-5.  Radio Music Licensing Committee, Inc. (RMLC) is

2   an entity that negotiates with PROs for public-performance licenses on behalf of radio

3   stations representing 90% of the country's terrestrial radio revenue.  *Id.* ¶¶ 1-2.

4        GMR and RMLC have sued each other, with each alleging the other is, among

5   other things, an illegal cartel in violation of Section 1 of the Sherman Act, 15 U.S.C.

6   § 1.  *See* 1st Am. Compl. (Dkt. No. 23); 2d Am. Compl., *RMLC v. GMR*, No. 2:19-cv-

7   3957 (C.D. Cal. June 20, 2019) (Dkt. No. 163).  Currently pending before the court

8   are RMLC's motion for judgment on the pleadings (Dkt. No. 95) and GMR's motion

9   to dismiss, *RMLC v. GMR*, No. 2:19-cv-3957 (C.D. Cal. July 11, 2019) (Dkt.

10  No. 167).  This Statement addresses the legal requirements for a buyers' cartel and

11  therefore focuses solely on the briefing related to RMLC's pending motion.

12                                          **ARGUMENT**

13  **I.  Agreements Among Buyers To Violate The Antitrust Laws Are Just As**

14      **Pernicious As Agreements Among Sellers.**

15        Section 1 of the Sherman Act bars "[e]very contract, combination in the form of

16  trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

17  States."  15 U.S.C. § 1.  Courts have long interpreted the Act to prohibit only

18  "unreasonable" restraints of trade.  *E.g.*, *Arizona v. Maricopa Cty. Med. Soc'y*, 457

19  U.S. 332, 343 (1982); *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).  The

20  reasonableness of most restraints is assessed under the "rule of reason."  *Maricopa*

21  *Cty.*, 457 U.S. at 343.  "As its name suggests, the rule of reason requires the factfinder

22  to decide whether under all the circumstances of the case the restrictive practice

23  imposes an unreasonable restraint on competition."  *Id.*

24

2

1    Not all restraints of trade are governed by the rule of reason.  *N. Pac. Ry.*, 356

2   U.S. at 5.  Some categories of restraints are so inherently destructive of competition

3   that they are subject to the per se rule, under which they are "deemed to be unlawful in

4   and of themselves."  *Id.*  By "treating categories of restraints as necessarily illegal,"

5   the per se rule "eliminates the need to study the reasonableness of an individual

6   restraint."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886

7   (2007); *see United States v. Mfrs.' Ass'n of Relocatable Bldg. Indus.*, 462 F.2d 49, 51-

8   52 (9th Cir. 1972) (discussing per se rule).  Examples of per se illegal restraints

9   include agreements among competitors to fix prices, *e.g.*, *Catalano, Inc. v. Target*

10  *Sales, Inc.*, 446 U.S. 643, 647 (1980), rig bids, *e.g.*, *United States v. Joyce*, 895 F.3d

11  673, 677 (9th Cir. 2018), or divide markets, *e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S.

12  46, 49-50 (1990).  *See also United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 293

13  (6th Cir. 1898) (in case involving horizontal price fixing, bid rigging, and market

14  allocation, rejecting a reasonable-prices defense because "we do not think that at

15  common law there is any question of reasonableness open to the courts with reference

16  to such a contract"), *aff'd as modified in other part*, 175 U.S. 211 (1899).  Such

17  restraints are referred to as "naked" restraints because they are not the product of

18  legitimate collaboration and thus "can have no purpose other than restricting output

19  and raising prices."  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d

20  210, 229 (D.C. Cir. 1986) (Bork, J.).

21       When competitors agree to a restraint that is per se illegal, it does not matter

22  whether they are buyers or sellers of goods or services.  Per se rules apply to

23  agreements among competing buyers in the same way that they apply to competing

24  sellers because the Sherman Act protects competition not only in output markets

3

1  where sellers compete to sell goods or services, but also in input markets where

2  businesses compete to purchase various inputs.  *See Weyerhaeuser Co. v. Ross-*

3  *Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323 (2007) (explaining, in a Section 2

4  case, that "[j]ust as sellers use output prices to compete for purchasers, buyers use bid

5  prices to compete for scarce inputs").  The Sherman Act "does not confine its

6  protection to consumers, or to purchasers, or to competitors, or to sellers.  Nor does it

7  immunize the outlawed acts because they are done by any of these."  *Mandeville*

8  *Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948).  Rather, the Act "is

9  comprehensive in its terms and coverage, protecting all who are made victims of the

10 forbidden practices by whomever they may be perpetrated."  *Id.*

11      In *Mandeville Island Farms*, for example, the Supreme Court concluded that it

12 was "clear" that an agreement among sugar refiners to pay a uniform price to sugar

13 beet growers "is the sort of combination condemned by the Act, even though the

14 price-fixing was by *purchasers*, and the persons specially injured under the treble

15 damages claim are sellers, not customers or consumers."  334 U.S. at 235 (footnotes

16 omitted; emphasis added).  In *Joyce*, 895 F.3d at 676, 677, similarly, the Ninth Circuit

17 described an agreement among potential *buyers* of foreclosed real property "to

18 suppress competition by refraining from bidding against each other at public auctions"

19 as "classic bid rigging."  Because such "bid rigging is a form of horizontal price

20 fixing," it is "a per se violation of the Sherman Act."  *Id.* at 677.  Finally, in *United*

21 *States v. Brown*, 936 F.2d 1042, 1044, 1045 (9th Cir. 1991), the Ninth Circuit

22 determined that an agreement among billboard advertising companies to "refrain from

23 bidding on each other's former [billboard] leaseholds for a period of one year after the

24 space was lost or abandoned" "clearly allocated markets between the two billboard

1   companies."  It did not matter that the agreement concerned an input market (billboard

2   leaseholds) for which the defendants were competing *buyers* because "[a] market

3   allocation agreement between competitors at the same market level is a classic per se

4   antitrust violation."  *Id.* at 1045.

5          For per se illegal restraints, "no showing of so-called competitive abuses or

6   evils which those agreements were designed to eliminate or alleviate may be

7   interposed as a defense."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218

8   (1940).  In the price-fixing context, for example, "the reasonableness of the prices"

9   fixed is irrelevant.  *Id.* at 229.  The Supreme Court has explained:  "Whatever

10  economic justification particular price-fixing agreements may be thought to have, the

11  law does not permit an inquiry into their reasonableness.  They are all banned because

12  of their actual or potential threat to the central nervous system of the economy."  *Id.* at

13  224 n.59; *see also, e.g.*, *Maricopa Cty.*, 457 U.S. at 348 (stating, in case concerning a

14  sellers' price-fixing agreement, that "[o]ur decisions foreclose the argument that the

15  agreements at issue escape per se condemnation because they . . . fix *maximum* prices"

16  (emphasis added)).  Accordingly, in a buyer-cartel case, it is no defense that the

17  agreement lowered the prices consumers pay.  *See Knevelbaard Dairies v. Kraft*

18  *Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (rejecting, as a mater of law, the

19  defense that "a conspiracy to depress prices would not harm consumers but benefit

20  them").

21  **II. Certain of RMLC's Arguments Misstate The Law On Buyers' Price-Fixing**

22      **Agreements And Should Be Rejected.**

23          In its briefing in support of its motion for judgment on the pleadings, RMLC

24  makes several statements about the law governing price-fixing agreements generally,

5

1 | and buyers' price-fixing agreements specifically, that are inconsistent with the case

2 | law.  These misstatements concern the intent required to join a price-fixing

3 | conspiracy, the nature of the agreement required to constitute price fixing, and the

4 | extent to which the success of a price-fixing conspiracy is a necessary element of a

5 | Section 1 claim.  The United States addresses each below.

6 | **A. Intent**

7 | Section 1 "does not prohibit all unreasonable restraints of trade . . . but only

8 | restraints effected by a contract, combination, or conspiracy."  *Bell Atl. Corp. v.*

9 | *Twombly*, 550 U.S. 544, 553 (2007) (brackets omitted; quoting *Copperweld Corp. v.*

10 | *Indep. Tube Corp.*, 467 U.S. 752, 775 (1984)).  A plaintiff alleging a Section 1

11 | violation must plead factual allegations plausibly showing that the defendant and its

12 | co-conspirator(s) "had a conscious commitment to a common scheme designed to

13 | achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S.

14 | 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d

15 | 105, 111 (3d Cir. 1980)).  When a plaintiff alleges the existence of a per se illegal

16 | restraint, that "necessarily illegal" restraint is itself the unlawful objective.  *Leegin*,

17 | 551 U.S. at 886.  For that reason, "[o]nce the agreement's existence is established, no

18 | further inquiry into the practice's actual effect on the market or the parties' intentions

19 | is necessary to establish a § 1 violation."  *In re Musical Instruments & Equip.*

20 | *Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

21 | In its motion for judgment on the pleadings, RMLC suggests that GMR was

22 | required to plead an additional fact to state a per se claim under Section 1: that

23 | "RMLC's members actually agreed with each other to do something that they

24 | *intended would harm competition*."  RMLC Mot. 10 (emphasis added).  That

6

1   suggestion is contrary to established law.  In civil cases in which a plaintiff has

2   pleaded horizontal price fixing, bid rigging, or market allocation, just like in criminal

3   cases in which those offenses are charged, a plaintiff "is not required to 'prove

4   specific intent to produce anticompetitive effects.'"  *Joyce*, 895 F.3d at 679 (criminal

5   case; quoting *United States v. Alston*, 974 F.2d 1206, 1213 (9th Cir. 1992)); *see also*

6   *In re Musical Instruments*, 798 F.3d at 1191 (explaining principle in a civil case).

7        RMLC never acknowledges this authority, but instead incorrectly argues that a

8   Section 1 plaintiff must plead plausibly that the defendant "intended to harm or

9   restrain trade or commerce."  RMLC Mot. 10 (quoting *Kendall v. VISA U.S.A., Inc.*,

10  518 F.3d 1042, 1047 (9th Cir. 2008)).  The precedent that RMLC quotes, however, is

11  the Ninth Circuit's description of what a *rule-of-reason* claim requires.  *See Kendall*,

12  518 F.3d at 1047 (citing *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d

13  504, 507 (9th Cir. 1989), which in turn described what "[t]he rule of reason requires

14  [of] a claimant").  There is no similar requirement for a per se claim.  *In re Musical*

15  *Instruments*, 798 F.3d at 1191.  Contrary to RMLC's suggestion, therefore, whether

16  GMR has plausibly pleaded that RMLC intended to harm commerce is irrelevant to

17  the question whether GMR has stated a per se claim.

18  **B. Price Fixing**

19       To plead a per se violation of the Sherman Act, a plaintiff must allege that the

20  defendant and its co-conspirator(s) agreed to a course of conduct that falls within a

21  category of restraints "deemed to be unlawful in and of themselves."  *N. Pac. Ry.*, 356

22  U.S. at 5.  When, as here, a plaintiff claims that a defendant was part of a conspiracy

23  among competitors to fix prices, the plaintiff must plausibly plead that two or more

24  competitors "agreed upon" pricing or a component of pricing.  *Socony-Vacuum*, 310

7

1   U.S. at 223.  An agreement would constitute price fixing, for example, "if the range

2   within which purchases or sales will be made is agreed upon, if the prices paid or

3   charged are to be at a certain level or on ascending or descending scales, if they are to

4   be uniform, or if by various formulae they are related to the market prices."  *Id.* at

5   222.  Additional examples include agreements that involve "an artificial stimulus

6   applied to (or at times a brake on) market prices, a force which distorts those prices,

7   [or] a factor which prevents the determination of those prices by free competition

8   alone."  *Id.* at 223.  For all price-fixing agreements, "the machinery employed by a

9   combination for price-fixing is immaterial," *id.*, because "[t]he aim and result of every

10  price-fixing agreement, if effective, is the elimination of one form of competition," *id.*

11  at 213 (quoting *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927)).

12        **1.  Categorization of Alleged Restraint**

13        RMLC wrongly argues that GMR's complaint does not plead price fixing but

14  rather, at most, describes a group-boycott claim.  *See* RMLC Mot. 19; RMLC

15  Reply 3-8, 18-19.  The two categories of restraints—price fixing and group boycott—

16  are not, however, mutually exclusive.  Parties can reach an agreement that "involves

17  not only a boycott but also a horizontal price-fixing arrangement."  *FTC v. Superior*

18  *Court Trial Lawyers Ass'n*, 493 U.S. 411, 436 n.19 (1990).

19        *Superior Court Trial Lawyers* is an example of a case in which an agreement

20  qualified as both types of restraints.  In that case, "a group of lawyers agreed not to

21  represent indigent criminal defendants in the District of Columbia Superior Court until

22  the District of Columbia government increased the lawyers' compensation."  493 U.S.

23  at 414.  "Prior to the boycott CJA [Criminal Justice Act] lawyers were in competition

24  with one another, each deciding independently whether and how often to offer to

8

1   provide services to the District at CJA rates." *Id.* at 422.  "The agreement among the

2   CJA lawyers was designed to obtain higher prices for their services and was

3   implemented by a concerted refusal to serve an important customer in the market for

4   legal services and, indeed, the only customer in the market for the particular services

5   that CJA regulars offered." *Id.* at 422-23.  The Supreme Court held that "[t]his

6   constriction of supply is the essence of 'price-fixing,' whether it be accomplished by

7   agreeing upon a price, which will decrease the quantity demanded, or by agreeing

8   upon an output, which will increase the price offered." *Id.* at 423 (quoting court of

9   appeals).  Without deciding whether the agreement was best characterized as a group

10  boycott or price fixing, the Court ruled that "[t]he horizontal arrangement among these

11  competitors was unquestionably a 'naked restraint' on price and output" governed by

12  the per se rule. *Id.* at 423, 436 & n.19.

13        *Superior Court Trial Lawyers* thus exemplifies the general principle that

14  implicit (or on occasion explicit) in many price-fixing agreements (that is, agreements

15  to sell at a particular price or according to a particular price structure) is a

16  commitment that also shares the characteristics of a boycott: that is, a commitment not

17  to sell at other prices or according to other price structures.  This general principle has

18  long been recognized in antitrust law. *See generally* George J. Stigler, *A Theory of*

19  *Oligopoly*, 72 J. Pol. Econ. 44, 46 (1964) (discussing how cartels try to prevent

20  "significant deviations from the agreed-upon prices").  It is equally applicable to the

21  sell-side and, as relevant here, the buy-side.  For instance, an analogous restraint to

22  *Superior Court Trial Lawyers* on the buy-side is a restraint in which a group of

23  competing buyers agreed among themselves not to purchase from a seller unless that

24  seller agreed to sell below a particular price.  Just as in *Superior Court Trial Lawyers*,

1   such an agreement among competitors would include both a refusal-to-deal

2   component and a price-fixing component.  Accordingly, and contrary to RMLC's

3   suggestion otherwise, the agreement would be per se illegal because it would

4   constitute a naked restraint among the competing buyers on price or quantity

5   purchased.  *Cf. Superior Court Trial Lawyers*, 493 U.S. at 436 & n.19.

6          *Superior Court Trial Lawyers* also makes clear that RMLC misstates the law

7   when it argues that "the Ninth Circuit has made clear [in *Adaptive Power Sols., LLC v.*

8   *Hughes Missile Sys. Co.*, 141 F.3d 947, 948 (9th Cir. 1998)] that the type of group

9   boycott claim alleged here is not a price fixing claim as a matter of law."  RMLC

10  Mot. 19.  *Adaptive* simply does not support RMLC's broad categorical rule (nor could

11  it in light of *Superior Court Trial Lawyers*).  *Adaptive* stands for the much more

12  modest proposition that a refusal to deal, without an agreement as to pricing, is not

13  price-fixing.  *See* 141 F.3d at 950 (distinguishing a "refus[al] to deal with a high-

14  priced supplier" *at all* from "a price-fixing conspiracy among competitors who agree

15  among themselves to fix their prices").  *Adaptive* did not involve a situation in which

16  competitors allegedly both agreed on pricing and agreed not to deal with a seller, as

17  GMR argues it has pleaded here.

18         In any event, GMR defends its complaint on the ground that it sufficiently

19  pleads "naked price-fixing among horizontal competitors" by alleging that "radio

20  companies that normally compete against each other for access to musical content

21  agreed with one another to fix the maximum price any of them would pay for that

22  content."  GMR Opp'n 1 (emphasis removed).  Because "the party who brings a suit is

23  master to decide what law he will rely upon," *The Fair v. Kohler Die & Specialty Co.*,

24  228 U.S. 22, 25 (1913), this Court should decide whether GMR has plausibly pleaded

1  price fixing, regardless of whether its allegations could also, or should instead, be

2  categorized as describing a group boycott.

### 2.  Agreement as to Third-Party Price Setting

4  RMLC peddles a similarly simplistic argument when it wrongly claims that

5  GMR has failed to state a price-fixing claim because it alleges merely an agreement

6  among buyers to insist that the sales price be determined by a third party (here, an

7  arbitrator), not an agreement on price itself.  RMLC Mot. 19; RMLC Reply 4-8, 19.

8  The mere fact, however, that a third party decides the price on which competitors will

9  agree does not, standing on its own, remove the restraint from the price-fixing

10  category.  That restraint is still an agreement to charge the same prices and thus still

11  eliminates competition on price.

12  The Ninth Circuit's conclusion in *Knevelbaard Dairies* that competitors can

13  engage in price fixing by manipulating inputs for a benchmark rate that is set by an

14  independent third party illustrates this point.  232 F.3d at 979.  There, the Ninth

15  Circuit held that the milk-producer plaintiffs' allegations—that purchasers of bulk

16  milk and cheese unlawfully suppressed the state's minimum price for milk produced

17  in the state—stated a claim of per se illegal buy-side price fixing.  *Id.* at 986-87

18  (Cartwright Act case relying on Sherman Act decisions concerning the per se rule).

19  Specifically, the plaintiffs had alleged that the purchasers coordinated their purchases

20  of bulk cheese at auction in order to manipulate the market bulk-cheese price, which

21  in turn was used by a third party—a state agency—to set the minimum milk price.  *Id.*

22  at 982.

23  RMLC is therefore wrong to argue that a third party's determination of the price

24  at which competitors agree to buy or sell a good or service is enough to remove the

1  agreement from the price-fixing category.  The agreement not to compete on price is

2  the per se illegal restraint, and the "machinery employed" to decide the agreed-upon

3  price—whether it is the manipulation of a benchmark as in *Knevelbaard Dairies* or, as

4  here, use of an arbitrator—is immaterial.  *Socony-Vacuum Oil Co.*, 310 U.S. at 223.

5     **C. Success of Conspiracy**

6        Finally, it is "well settled that conspiracies under the Sherman Act are not

7  dependent on any overt act other than the act of conspiring."  *Socony-Vacuum*, 310

8  U.S. at 224 n.59.  As the Supreme Court has explained, "[i]t is the 'contract,

9  combination * * * or conspiracy, in restraint of trade or commerce' which § 1 of the

10  Act strikes down, whether the concerted activity be wholly nascent or abortive on the

11  one hand, or successful on the other."  *Id.* (ellipsis in original).  Accordingly, "a

12  conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it

13  is not established that the conspirators had the means available for accomplishment of

14  their objective, and though the conspiracy embraced but a part of the interstate or

15  foreign commerce in the commodity."  *Id.*

16        RMLC's reply brief incorrectly argues that a buyers' price-fixing agreement

17  must be successful to violate Section 1.  According to RMLC, if the seller does not

18  accept the buyers' agreed-upon price, the buyers' agreement is merely an "attempt to

19  fix prices," and therefore lawful.  *See* RMLC Reply 6 & n.4 (quoting *Liu v. Amerco*,

20  677 F.3d 489, 493 (1st Cir. 2012)).  RMLC conflates the requirement that there be an

21  *agreement* to fix prices with the *successful execution* of that agreement.

22        In the *Liu* case that RMLC quotes, the defendant allegedly made "express

23  proposals to a competitor to raise prices" that were "spurned."  677 F.3d at 494-95.

24  There was, accordingly, no "contract, combination . . . or conspiracy" between the

1  competitors that could violate Section 1.  If there had been such an agreement,

2  whether the conspiring competitors were successful in convincing customers to make

3  purchases at their agreed price would be irrelevant to the question whether there had

4  been a Section 1 violation (although it might affect what if any recovery would be

5  available to a private plaintiff).  For as the Supreme Court has long held, "a

6  conspiracy to fix prices violates § 1 of the Act," and no matter "whether the concerted

7  activity be wholly nascent or abortive on the one hand, or successful on the other."

8  *Socony-Vacuum*, 310 U.S. at 224 n.59; *see also Nash v. United States*, 229 U.S. 373,

9  378 (1913) (explaining that Section 1 "does not make the doing of any act other than

10  the act of conspiring a condition of liability"); *United States v. SKW Metals & Alloys,*

11  *Inc.*, 195 F.3d 83, 92 (2d Cir. 1999) ("Entry into an agreement to fix prices—even if

12  the implementation of such an agreement is unsuccessful—is the illegal conduct under

13  the Sherman Act, 15 U.S.C. § 1."); *United States v. Hayter Oil Co.*, 51 F.3d 1265,

14  1273 (6th Cir. 1995) ("the success of a price-fixing agreement is irrelevant for

15  establishing a violation of § 1 of the Sherman Act").  This Court should therefore

16  reject RMLC's argument that GMR cannot state a price-fixing claim because,

17  according to the operative complaint, GMR did not accept RMLC's alleged price

18  demand.

19

20

21

22

23

24

**CONCLUSION**

For the foregoing reasons, the United States respectfully recommends that the Court apply the above-discussed law when it evaluates whether GMR has stated a per se price-fixing claim against RMLC.

Dated:  December 5, 2019.                    Respectfully submitted.


MAKAN DELRAHIM
  Assistant Attorney General
MICHAEL F. MURRAY
  Deputy Assistant Attorney General

/s/ Mary Helen Wimberly
DANIEL E. HAAR
    (daniel.haar@usdoj.gov)
MARY HELEN WIMBERLY
    (maryhelen.wimberly@usdoj.gov)
  Attorneys

U.S. Department of Justice
Antitrust Division
Appellate Section
950 Pennsylvania Avenue, N.W.
Room 3224
Washington, D.C. 20530-0001
Telephone: (202) 514-4510
Facsimile:  (202) 514-0536

Counsel for the United States of America