SULLIVAN & CROMWELL LLP
Joseph J. Matelis (*pro hac vice* forthcoming)
matelisj@sullcrom.com
Tyler S. Badgley (*pro hac vice* forthcoming)
badgleyt@sullcrom.com
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330

Alexa M. Lawson-Remer (SBN 268855)
lawsonr@sullcrom.com
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

*Attorneys for Movant*
*National Association of Broadcasters*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| GLOBAL MUSIC RIGHTS, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>RADIO MUSIC LICENSE COMMITTEE, INC. et al.,<br><br>*Defendants.* | Case No. 2:16-cv-9051-TJH(ASx)<br><br>**[PROPOSED] BRIEF OF AMICUS CURIAE NATIONAL ASSOCIATION OF BROADCASTERS**<br><br>The Honorable Terry J. Hatter, Jr.<br><br>Hearing Date: February 24, 2020<br><br>Hearing Time: Under Submission |

# TABLE OF CONTENTS

| | Page |
|---|---|
| Statement of Interest | 1 |
| Argument | 2 |
| Conclusion | 6 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) ............................................................................................. 6

*Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................. 5

*FTC* v. *Owens-Illinois, Inc.*,
681 F. Supp. 27 (D.D.C. 1988) ........................................................................... 2

*FTC* v. *PPG Indus.*,
798 F.2d 1500 (D.C. Cir. 1986) .......................................................................... 2

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
551 U.S. 877 (2007) ............................................................................................. 5

*Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery*,
472 U.S. 284 (1985) ............................................................................................. 5

*Olin Corp.* v. *FTC*,
986 F.2d 1295 (9th Cir. 1993) ............................................................................ 2

*Oscar Ins. Co. of Fla.* v. *Blue Cross and Blue Shield of Fla., Inc.*,
2019 WL 5295091 (M.D. Fla. 2019) ................................................................. 2

*U.S.* v. *Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ............................................................................ 2

*U.S.* v. *ASCAP*,
2001 WL 1589999 (S.D.N.Y. 2001) .................................................................. 3

*U.S.* v. *BMI (Application of AEI Music Network, Inc.)*,
275 F.3d 168 (2d Cir. 2001) ............................................................................... 3

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................................. 6

**Other Authorities**

28 U.S.C. § 517 ........................................................................................................... 2

U.S. DEP'T OF JUSTICE AND FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR COLLABORATION AMONG COMPETITORS (April 2000) ................................................................................................................... 4, 5

SULLIVAN & CROMWELL LLP

**STATEMENT OF INTEREST**

Founded in 1922, the National Association of Broadcasters ("**NAB**") is an advocacy organization for television and radio broadcasters in the United States, representing broadcast networks and more than 8,300 terrestrial television and radio stations. NAB's members include digital television broadcasters, large nationwide broadcasting companies with hundreds of radio stations, streaming radio platforms, and small broadcasters with one or just a few radio stations. Our members provide our country's citizens entertainment and information, are a vital lifeline during emergencies, and unite our country's major cities, small towns, and rural areas. NAB advocates on behalf of all its member-broadcasters with regards to legislation, regulation, and legal matters as a part of its commitment to encouraging content and technology innovation, highlighting the impact and unique ways that stations serve their communities, and improving the quality of broadcasting.

As an advocate for broadcasters, NAB is regularly involved in legal matters. NAB comments on proposed rulemakings and actions by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice (the "**Department**"). NAB also promotes its objectives by participating as amicus curiae in cases raising issues important to the broadcasting community. Music licensing has long been an arena requiring judicial intervention, and NAB has developed substantial expertise on the issues related to music licensing through its activities on behalf of the broadcasting community.

The relationship between performing rights organizations ("**PROs**") and content licensees is of particular interest to NAB, and one with which NAB has had substantial involvement stemming back to 1934, when the Department brought its seminal action seeking to alleviate the anticompetitive effects of the activities of the American Society of Composers, Authors, and Publishers ("**ASCAP**"). NAB has been and continues to be involved in actions by the

Department and courts regarding the ASCAP and Broadcast Music, Inc. ("BMI") consent decrees. Similarly, NAB was involved in the development and passage of the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, which also involves the relationship between PROs and content licensees. NAB has a strong interest in the litigation between the Radio Music Licensing Committee ("**RMLC**") and Global Music Rights ("**GMR**"), as it too involves the relationship between licensees and a PRO, and threatens to harm NAB members that are not involved directly in the litigation.

## ARGUMENT

In this brief, NAB addresses the U.S. Department of Justice's Statement of Interest insofar as it suggests that buying collaborations should be per se illegal.

As an initial matter, it is worth emphasizing that this Court owes no deference to the views of the United States offered here. "28 U.S.C. § 517 does not create a right for the Government to appear and submit argument in any case in which the United States articulates an interest in the development and correct application of the law." *Oscar Ins. Co. of Fla.* v. *Blue Cross and Blue Shield of Fla., Inc.*, 2019 WL 5295091, at *1 (M.D. Fla. 2019) (describing the Government's briefing as "unhelpful"). Courts "owe[] no particular deference to" the views of the United States about how to construe the antitrust laws. *U.S.* v. *Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017); *see also, e.g., Olin Corp.* v. *FTC*, 986 F.2d 1295, 1299 (9th Cir. 1993) (Department policy is "not binding on the courts"); *FTC* v. *PPG Indus.*, 798 F.2d 1500, 1503 n.4 (D.C. Cir. 1986) (Department policy is "by no means to be considered binding on the court"); *FTC* v. *Owens-Illinois, Inc.*, 681 F. Supp. 27, 48 (D.D.C. 1988) (characterizing Department legal analysis as a "suggest[ion]"). NAB further notes that it is unorthodox for the Department to intercede in private litigation, especially at the pleading stage.

Turning to the substance of the Statement of Interest, implicit in it are three substantial deviations from historical Department policy that are relevant to assessing the Statement of Interest's usefulness to the Court. *First*, the Statement of Interest offers no explanation for the striking shift from protecting our nation's citizens against the illegal activities of PROs to suggesting (through a Statement of Interest in a private litigation) that a PRO is a victim of per se illegal conduct in an industry that has been under active Department supervision for decades. Indeed, the Department has been active in enforcing the antitrust laws against the illegal activity of PROs since at least 1934. *U.S.* v. *ASCAP*, Equity Number 78-388 (S.D.N.Y. filed Aug. 10, 1934). During the intervening decades since the Roosevelt Administration, the Department has, heretofore, fought to protect the country from the anticompetitive effects of PROs. As part of that decades-long mission, the Department repeatedly acknowledged the role of entities like RMLC organized for the purpose of collectively negotiating reasonable rates with PROs—and never once to NAB's knowledge suggested to a court that they were illegal let alone per se illegal. *E.g.,* Brief of the Department of Justice at 8 n.5 *U.S.* v. *BMI (Application of AEI Music Network, Inc.)*, 275 F.3d 168 (2d Cir. 2001), available at https://www.justice.gov/atr/case-document/file/489861/download ("[s]ome classes of user, such as broadcasters, negotiate their rates with ASCAP and BMI through trade associations organized for that purpose"); Mem. of the Department of Justice in Response to Public Comments on the Joint Motion to Enter Second Amended Final Judgment (Mar. 16, 2001), *U.S.* v. *ASCAP*, 2001 WL 1589999 (S.D.N.Y. 2001), available at https://www.justice.gov/atr/case-document/file/485971/download (noting that negotiating groups within an industry "purport[ed] to set a rate for the industry").

*Second*, even assuming that GMR has sufficiently pleaded the existence of an agreement among competitors, the Department's long-standing enforcement policy about competitor collaborations unequivocally characterizes

buying collaborations as arrangements that are subject to the rule of reason, not the per se rule.  U.S. DEP'T OF JUSTICE AND FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR COLLABORATION AMONG COMPETITORS § 3.31 (April 2000) (hereinafter "COMPETITOR COLLABORATION GUIDELINES").  Under the Department's own long-standing enforcement standards, it is clear that buying collaborations are not per se illegal so long as they are reasonably related to an efficiency:

> If, however, participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal.

COMPETITOR COLLABORATION GUIDELINES § 3.2 at 8.  GMR's own complaint gives ample proof that music licensing is complex, difficult, and time-consuming, and that licensee collaboration would have obvious benefits, which helps explain why, instead of approaching each radio station individually, "GMR approached RMLC with the explicit purpose of negotiating license fees for its members" and why the Southern District of New York has mandated fees "to fund the RMLC's operations."  GMR Complaint and Demand for Jury Trial ¶¶ 59, 99, Dkt. 23.  PROs rely on blanket licenses "due to the enormous administrative costs that would occur in a world where each performance of each composition is individually negotiated and documented."  *Id*. ¶ 29.  Further evidencing the Department's long history of treating buying collaborations as entities permissible under the rule of reason are no fewer than thirty-two Business Review Letters from every Administration since President Ford condoning the sort of conduct that the Department now suggests is per se illegal.  (The attached Appendix provides descriptions and citations.)  Given this precedent, the Department's about-face here is unjustified and unwarranted.

SULLIVAN & CROMWELL LLP

*Third*, the December 2019 Statement also fails to address why the Department is seeking to encourage this Court to expand the scope of per se illegality under the antitrust laws. As the United States has previously acknowledged, "Per se treatment is inappropriate when the economic impact of the type of conduct at issue is not obviously and predictably anticompetitive." Brief for the United States as Amicus Curiae Supporting Petitioner, *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877 (2007). Prior Administrations have consistently noted the potential chilling effect of overbroad approaches to the application of antitrust law. Rules that attempt to distinguish precisely between competitive and anticompetitive practices can "court[] intolerable risks of chilling legitimate conduct." *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993). This is particularly true where the underlying conduct at issue is not merely not illegal but actually procompetitive—which the Department has previously acknowledged is the case with buying collaborations:

> Competitor collaborations may involve agreements jointly to purchase necessary inputs. Many such agreements do not raise antitrust concerns and indeed may be procompetitive. Purchasing collaborations, for example, may enable participants to centralize ordering, to combine warehousing or distribution functions more efficiently, or to achieve other efficiencies.

COMPETITOR COLLABORATION GUIDELINES § 3.31(a). *See also* Brief for the United States as Amicus Curiae Supporting Reversal, *Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery*, 472 U.S. 284 (1985) ("Joint ventures of competitors, including purchasing cooperatives, are often substantially procompetitive."); Brief for the United States as Amicus Curiae Supporting Petitioner, *Leegin Creative Leather Prods., Inc.*, 551 U.S. 877 ("Application of a per se rule to conduct that often would be procompetitive has the potential to erode the rationale for per se treatment and foster judicial reluctance to use such a blunt instrument even in those circumstances when it is appropriate."). Low pleading standards in private antitrust actions can particularly risk chilling efficient economic activity—"the

-5-

very conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004). Claims, like GMR's per se claims in this action, that are not promptly dismissed can create economic inefficiencies by forcing parties to defend procompetitive behavior, and in so doing, chill procompetitive conduct. "Meritless antitrust suits, … if not promptly dismissed, [] create economic inefficiencies, chill procompetitive conduct, and act as a drain on the economy." Brief for the United States as Amicus Curiae Supporting Petitioners, *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007). In its Statement of Interest, the Department fails to acknowledge these traditional concerns about the application of the antitrust laws to overly broad per se claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss GMR's per se claims against RMLC.

Respectfully submitted,

Dated: January 14, 2020   By:   /s/ Alexa Lawson-Remer
SULLIVAN & CROMWELL LLP
Alexa M. Lawson-Remer (SBN 268855)
lawsonr@sullcrom.com
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Joseph J. Matelis (*pro hac vice* forthcoming)
matelisj@sullcrom.com
Tyler S. Badgley (*pro hac vice* forthcoming)
badgleyt@sullcrom.com
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
*Attorneys for Movant National Association of Broadcasters*

# Appendix

| Year | Requesting Entity | Relevant Language | Citation |
|------|-------------------|-------------------|----------|
| 2012 | STARS Alliance LLC | "To the extent that the proposed cooperative activities increase efficiencies that result in lower costs, the proposed conduct could have a procompetitive effect." | U.S. Dep't of Justice Business Review Letter to STARS All. LLC (Dec. 20, 2012) |
| 2000 | Containers America LLC | "Finally, we note that to the extent that the contemplated joint selling and/or purchasing activities provide steel drum customers with additional purchasing options or lower their costs, the proposed conduct could have procompetitive effects." | U.S. Dep't of Justice Business Review Letter to Containers Am. LLC (Mar. 8, 2000) |
| 1999 | NSM Purchasing Association | "Moreover, to the extent that the proposed joint purchasing reduces NSM members' costs and such savings are shared with consumers, the proposal could have a procompetitive effect." | U.S. Dep't of Justice Business Review Letter to NSM Purchasing Ass'n (Jan. 13, 1999) |
| 1998 | Armored Transport Alliance | "Finally, the proposed joint purchasing by ATA on behalf of its members should not have any adverse effects on competition." | U.S. Dep't of Justice Business Review Letter to Armored Transport All. (Mar. 12, 1998) |

SULLIVAN & CROMWELL LLP

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1997 | California Large Electric Power Purchasing Association | "To the extent that the contemplated joint purchasing reduces the costs of electric power to CLEPPA's members, it could have the procompetitive effect of increasing output to the benefit of consumers. " | U.S. Dep't of Justice Business Review Letter to California Large Elec. Power Purchasing Ass'n (Nov. 20, 1997) |
| 1995 | Business Travel Contractors Corp. | "The BTCC proposal does not appear to pose a significant risk of anticompetitive results and may have procompetitive effects." | U.S. Dep't of Justice Business Review Letter to Bus. Travel Contractors Corp. (July 14, 1995) |
| 1993 | Nickel Users Purchasing Association, Inc. | "There also appears to be a procompetitive justification for this proposal. Collective price negotiation has the potential to create efficiencies that could result in lower prices for nickel and thus for nickel-based products manufactured by the members." | U.S. Dep't of Justice Business Review Letter to Nickel Users Purchasing Ass'n, Inc. (Jun. 2, 1993) |
| 1989 | Shippers of Recycled Textiles, Inc. | "In the past, we have endeavored to conduct the required investigation when a shippers' association is being formed." | U.S. Dep't of Justice Business Review Letter to Shippers of Recycled Textiles, Inc. (Dec. 11, 1989) |

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1988 | FRA Shippers' Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the formation and operation of a shippers' association could be procompetitive." | U.S. Dep't of Justice Business Review Letter to FRA Shippers' Ass'n (Jun. 17, 1988) |
| 1988 | Columbia River Shippers Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that occurs, the formation and operation of a shippers' association could be procompetitive." | U.S. Dep't of Justice Business Review Letter to Columbia River Shippers Ass'n (May 30, 1988) |
| 1988 | North American Shippers' Association, Inc. | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the formation and operation of a shippers' association could be pro-competitive." | U.S. Dep't of Justice Business Review Letter to N. Am. Shippers' Ass'n, Inc. (Mar. 16, 1988) |
| 1987 | The Shippers' Association, Inc. | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the proposed activities would be procompetitive." | U.S. Dep't of Justice Business Review Letter to The Shippers' Ass'n (Nov. 17, 1987) |

SULLIVAN & CROMWELL LLP

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1987 | Pacific Northwest Asia Shippers Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the proposed activities would be procompetitive." | U.S. Dep't of Justice Business Review Letter to Pac. NW Asia Shippers Ass'n (Oct. 28, 1987) |
| 1987 | American Furniture Manufacturers Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the proposed activities would be procompetitive." | U.S. Dep't of Justice Business Review Letter to Am. Furniture Mfrs. Ass'n (July 6, 1987) |
| 1987 | Fashion Accessories Shippers' Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that this occurs, the formation and operation of a shippers' association would be procompetitive." | U.S. Dep't of Justice Business Review Letter to Fashion Accessories Shippers' Ass'n (Mar. 25, 1987) |
| 1986 | Hong Kong Shippers' Association | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that occurs, the formation and operation of a shippers' association could be pro-competitive." | U.S. Dep't of Justice Business Review Letter to Hong Kong Shippers' Ass'n (July 3, 1986) |

SULLIVAN & CROMWELL LLP

| Year | Requesting Entity | Relevant Language | Citation |
|------|-------------------|-------------------|----------|
| 1986 | Gulf Wine and Spirit Shippers' Council Inc. | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that occurs, the formation and operation of a shippers' association could be procompetitive." | U.S. Dep't of Justice Business Review Letter to Gulf Wine and Spirits Shippers' Council, Inc. (May 30, 1986) |
| 1985 | International Beverage Shippers Association, Inc. | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates . . . [which] could be procompetitive." | U.S. Dep't of Justice Business Review Letter to Int'l. Beverage Shippers Ass'n, Inc. (Dec. 13, 1985) |
| 1985 | Household Goods Forwarders Association of America, Inc. | "Collective purchasing of transportation services generally produces significant efficiencies and therefore can result in enhanced competition, increased output, and lower consumer prices." | U.S. Dep't of Justice Business Review Letter to Household Goods Forwarders Ass'n of Am., Inc. (Sept. 19, 1985) |
| 1985 | Mid-America National Cable Television Cooperative, Inc. | "The cooperative will negotiate on behalf of its members with suppliers of programing and hardware used by cable companies. . . . On the basis of the information currently available to us, it does not appear that the operation of the Mid-America cooperative will be anticompetitive." | U.S. Dep't of Justice Business Review Letter to Mid-America Nat'l. Cable Telev. Coop., Inc. (Aug. 30, 1985) |

-11-

| Year | Requesting Entity | Relevant Language | Citation |
|------|-------------------|-------------------|----------|
| 1985 | Wine and Spirits Shippers Association, Inc. | "Collective purchasing can produce certain efficiencies that may increase output and enhance competition." | U.S. Dep't of Justice Business Review Letter to Wine and Spirits Shippers Ass'n, Inc. (Aug. 30, 1985) |
| 1985 | New World Shippers' Association | "The formation and operation of NWSA may result in significant economies through reduced transportation and negotiation costs for shippers, and appears to have little potential for producing anticompetitive harm." | U.S. Dep't of Justice Business Review Letter to New World Shippers' Ass'n (Aug. 26, 1985) |
| 1985 | American Institute for Shippers' Associations, Inc. | "Collective negotiation of FAK rates also could raise competitive concerns if it significantly impaired competition either among shippers' associations or among individual shippers. Neither appears to be the case here." | U.S. Dep't of Justice Business Review Letter to Am. Inst. For Shippers' Ass'n, Inc. (Feb. 12, 1985) |
| 1985 | Transportation Brokers Conference of America, Inc. | "Collective purchasing can produce certain efficiencies that may increase output and enhance competition." | U.S. Dep't of Justice Business Review Letter to Trans. Brokers Conf. of Am., Inc. (Feb. 8, 1985) |

SULLIVAN & CROMWELL LLP

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1984 | Radio Advertising Bureau | "We understand, based on the information and materials you have submitted in support of your request, that the RAB negotiating committee would represent virtually all radio stations in the country in negotiations designed to obtain from Arbitron . . . a new ratings contract with Arbitron or a replacement vendor. . . . Even if RAB is a monopsonist, the proposed joint purchasing might not have demonstrable anticompetitive effects." | U.S. Dep't of Justice Business Review Letter to Radio Advert. Bureau (May 8, 1984) |
| 1983 | National Small Shipments Traffic Conference, Inc. | "Collective rate negotiation has the potential to create efficiencies that result in lower freight rates. To the extent that occurs, the formation of the shippers' council could be pro-competitive." | U.S. Dep't of Justice Business Review Letter to Nat'l. Small Shipments Traffic Conf., Inc. (July 19, 1983) |

SULLIVAN & CROMWELL LLP

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1983 | Greater Detroit Theatre Operators Purchasing Corp. | "We further understand that Greater Detroit will purchase goods and services such as theater equipment, resale merchandise, and advertising and promotional services for its participating shareholders. . . . [W]e are aware of no likelihood that Greater Detroit's joint purchasing program will restrain trade in any relevant product market." | U.S. Dep't of Justice Business Review Letter to Greater Detroit Theatre Operators Purchasing Corp. (Jun. 16, 1983) |
| 1982 | Ohio Hospital Purchasing Consortium | The Department "does not presently intend to institute an enforcement proceeding to prevent OHPC from implementing its hospital group purchasing plan." | U.S. Dep't of Justice Business Review Letter to Ohio Hosp. Purchasing Consortium (Jun. 9, 1982) |
| 1981 | New York State Association of Service Stations, Inc. | "It has been held that acquisition and retention of greater buying power through a cooperative purchasing agency is not, in and of itself, inherently unlawful." | U.S. Dep't of Justice Business Review Letter to N.Y. State Ass'n of Service Stations, Inc. (Mar. 27, 1981) |

-14-

| Year | Requesting Entity | Relevant Language | Citation |
|---|---|---|---|
| 1978 | Motion Picture Exhibitor Cooperative | The Department determined to take no action, but acknowledged that "[t]his expression . . . would not bar appropriate action by the Department if the actual operation of the proposed cooperative proved to have anticompetitive consequences." | U.S. Dep't of Justice Business Review Letter to Motion Picture Exhibitor Coop. (Apr. 11, 1978) |
| 1975 | Gales Rexall Drug | "The association expects to contract with manufacturers and wholesalers of these products to sell the same to its members at quantity discounts. . . . [W]e have no present intention to institute action in this matter." | U.S. Dep't of Justice Business Review Letter to Gales Rexall Drug (Nov. 17, 1975) |

SULLIVAN & CROMWELL LLP